COMMONWEALTH *vs.* JOHN H. CHANCE & another.

Suffolk.    January 27, 1899. — September 7, 1899.

Present: HOLMES, C. J., KNOWLTON, LATHROP, BARKER, & HAMMOND, JJ.

*Homicide — Challenge to Array — View by Jury — Matter within Discretion of Court — Evidence — Testimony before Grand Jury — Conversation with Officer — Order of Proof at Trial — Declaration of Deceased Person — Res Gestæ — Exceptions — Instructions.*

An objection which does not affect the whole panel of jurors is not a ground of challenge to the array.

Whether at a trial for homicide a view shall be ordered of the place where the murder was committed, and of the route along which one of two defendants was alleged to have fled, the view being objected to by the other defendant, is within the discretion of the court.

Although a view, which is refused at a trial for homicide, might have been evidence if it had been taken, photographs and plans found to be instructive properly are admitted.

The government, for the purpose of contradicting a witness called by it, at the trial of an indictment, may prove that he testified differently before the grand jury.

If three conversations between a person arrested on suspicion of murder and police officers are separated in time, and each is complete in itself and in no way refers forward to things still to be said, or depends upon them, for explanation or qualification of what has been said already, although they all relate to the same subjects, they do not make one conversation, and such person, at the trial of an indictment against him for the murder, is not entitled, upon the court deciding to exclude the third conversation, to have the other two excluded also.

If it is important, at a trial for homicide, to prove whether the defendant shaved off his mustache before or after the murder, a witness may testify that he did not remember the time, but that he "had a sign," that the night before there was a fight at a certain store, and the following morning the mustache was taken off, another witness then fixing the date of the fight as the date of the murder.

If, at the trial of an indictment for homicide, the government puts in evidence that after the murder the defendant was seen running rapidly from the place, and the evidence for the defendant is that by reason of injuries and illness he was unable to run fast, the government, although it knew that this defence would be set up, is not bound to put in all its evidence as to the defendant's ability to run as part of its case in chief, but properly is allowed to put in such evidence in rebuttal.

At the trial of an indictment for the murder of A., evidence was offered by the defence under St. 1898, c. 535, that B., since dead, during a quarrel with her husband, went to a closet, took out two bullets and said, "The third one killed A." The court was not satisfied that the declaration was made in good faith and upon personal knowledge. *Held,* that the evidence properly was excluded.

It is not the law that any and all conversation which happens to be going on at the time of an act can be proved if the act can be proved.

At the trial of an indictment for homicide, a witness testified that she had seen one B. wearing an overcoat like the one produced, which belonged to the defendant, and was found in what was supposed to be the path of the murderer's flight. The witness did not identify the coat, or in any way fix the time when she saw B. wearing one like it. She was asked what B. said at the time. It did not appear what the answer was expected to be. *Held,* that no error appeared in its exclusion.

If a request for a ruling at a trial for homicide is given in substance, except that the judge does not use the phrase, "abiding conviction amounting to a moral certainty," as explanatory of the obligation of the government to prove its case beyond a reasonable doubt, no ground of exception appears.

At the trial of an indictment for homicide, the judge refused to instruct the jury that "malice means intent to kill or do grievous bodily harm," and that, if there was such precedent intent, "the homicide is murder. If there is no precedent intent, there is no murder"; and after defining murder in the usual way, instructed them that malice "means the state of mind which prompts the conscious violation of law to the prejudice and injury of another," and "is intended to denote an action flowing from any wicked and corrupt motive," and that homicide "may be manslaughter when done by a rash and wanton act without malice; or it may be with purpose and intent to do the unlawful act of killing accompanied by malice aforethought, and then it is murder. It is with the latter charge of murder that we have here to deal." *Held,* that the defendant had no ground of exception.

INDICTMENT, against John H. Chance and Arthur Hagan, for the murder of Charles L. Russell, on April 4, 1898, at Boston. At the trial in the Superior Court, before *Bishop* and *Stevens,* JJ., the jury returned a verdict of guilty of murder in the second degree as to Chance, and of not guilty as to Hagan; and Chance alleged exceptions, which appear in the opinion.

*H. P. Harriman & G. P. Wardner,* for Chance.

*M. J. Sughrue,* Assistant District Attorney, for the Commonwealth.

HOLMES, C. J.   1. If the challenge to the array was in due form, and if an exception was taken to the decision overruling it, still, fairly construed, it does not allege on independent grounds that the law as to posting the jury list in the city of Boston was not complied with, but rather that the records set forth show that it was not, or do not show that it was.   St. 1897, c. 515, § 2.   We do not mean to give any countenance to the objection, but for the purposes of decision it is enough to say that, if it were well taken, it does not affect the whole panel, and therefore is not a ground of challenge to the array.   *Commonwealth* v. *Walsh,* 124 Mass. 32, 38.

2. The second exception is to the refusal of the court to order a view of the place where the murder was committed and of the route along which the defendant Chance was alleged to have fled.   It was expected that such a view would strengthen the argument for Chance that he was unable to run as the murderer ran.   On the other hand the view was objected to by the defendant Hagan.   The whole matter rested in the discretion of the court.   The language of the chapter as to criminal trials is that the court "may order a view," etc.   Pub. Sts. c. 214, § 11. In the chapter concerning juries the language is, "The jury may . . . be taken to view the premises . . . when it appears to the court that such view is necessary to a just decision."   Pub. Sts. c. 170, § 43.   The word "may" implies a discretion.   Without such governance views might become rather an obstruction than an aid to justice, and we believe that when extended from their ancient use in real actions they always have been held to be subject to the discretion of the court both in this State and in England.   *Commonwealth* v. *Webster,* 5 Cush. 295, 298, 299. *The Queen* v. *Martin,* L. R. 1 C. C. 378, 381.   *Anonymous,* 6 Mod. 211.   *Anonymous,* 1 Barnard. 144.   *Attorney General* v. *Green,* 1 Price, 130.   1 Burr. 252, 254, 255.   *Anonymous,* 2 Chitty, R. 422.   This being so, although the view might have been evidence if it had been taken, photographs and plans found to be instructive properly were admitted.

3. A woman with whom Chance lived was called by the gov-

ernment, and gave testimony tending to prove innocence by way of alibi, and of his appearance on coming home after the hour of the murder. The government then was allowed to ask her whether she had not testified before the grand jury that Chance returned in about half an hour after his going out, which was fixed by her at about the hour of the murder, and that he was out of breath as though he had been running, white as a sheet and nervous. This was admitted to lay a foundation for contradiction under Pub. Sts. c. 169, § 22. It is objected that it violated the secrecy of proceedings before the grand jury. But this objection is disposed of by *Commonwealth* v. *Mead*, 12 Gray, 167. *New Hampshire Ins. Co.* v. *Healey*, 151 Mass. 537, 538.

4. The defendant was arrested on April 20, 1898. On that day he had a conversation with an officer in which he gave a certain account of where he was on the night of the murder, and admitted that he owned a coat found in the alleged path of the running murderer, and that he had it about the hour of the murder. On the morning of the next day the defendant was asked in the presence of several officers concerning his whereabouts, and gave a somewhat different account, and said that he went to bed about half-past eight or nine, whereas the testimony of the woman with whom he lived was that he was away from home after eight for a greater or less time. On the afternoon of that day the defendant was arraigned, and in the evening the same officers, with one exception, examined him at length with a stenographer. In the course of this last examination there was evidence, more or less contradicted, of certain words being used by an officer which the court found or ruled to be such an inducement as to render the portion of the examination which followed inadmissible. The court thereupon found or ruled that the previous part of the examination was so connected with the later part that none could be put in. The defendant then asked the court to go still further, and to rule that the two previous examinations were so connected with the last that they also should be excluded; but upon the court refusing so to rule, preferred to have the whole of the third examination go in, saving his exception to the refusal to exclude all three.

We do not see what we can say by way of argument to make

the independence of the three conversations plainer than it is made by a simple statement of the facts. They were separated in time, and each was complete in itself and in no way referred forward to things still to be said, or depended upon them, for explanation or qualification of what had been said already. The fact that they all related to the same subjects, as they naturally would, did not make them one. *Rex* v. *Reason,* 1 Strange, 499, 500. The court went to the extreme in its anxiety to protect the defendant's rights. If it had gone further, it clearly would have been wrong. See *Commonwealth* v. *Keyes,* 11 Gray, 323, 324; *Adam* v. *Eames,* 107 Mass. 275; *Commonwealth* v. *Campbell,* 155 Mass. 537; *Commonwealth* v. *Russell,* 160 Mass. 8, 10.

It is argued further that the conversations were not voluntary in view of the defendant's confinement, recent recovery from a fit of delirium tremens, etc. We have no disposition to make the rule of exclusion stricter than it is under our decisions. It goes to the verge of good sense, at least. *Regina* v. *Baldry,* 2 Den. C. C. 430, 445, 446. *Regina* v. *Reeve,* 12 Cox C. C. 179, 180. *Hopt* v. *People,* 110 U. S. 574, 584. The finding that the conversations were voluntary was fully warranted. See *Commonwealth* v. *Bond,* 170 Mass. 41.

Finally, it is slightly pressed that the conversations had nothing in them tending to criminate the defendant, while it is insisted that he suffered by their being admitted. We believe that in stating the first two we have indicated sufficiently their relevancy.

5. It being important to prove whether the defendant shaved off his mustache before or after the murder, a witness was permitted to testify through an interpreter that he did not remember the time but that he had a sign, — that the night before there was a fight at Kasanof's store, and the following morning the mustache was taken off. This was excepted to. Another witness then fixed the date of the fight at Kasanof's store as the date of the murder. The evidence was admissible on elementary principles. *McDonald* v. *Savoy,* 110 Mass. 49, 50.

6. The government put in evidence that after the murder the defendant Chance was seen running rapidly from the place. A part of the evidence for the defence was that Chance, by reason

of injuries and illness, was unable to run fast. The government knew that this defence would be set up, and experts on both sides had examined Chance beforehand. The defence was indicated further by the cross-examination of the witnesses who said that they saw Chance run. Under these circumstances the defendant contended that the government was bound to put in all its evidence as to Chance's ability to run as part of its case in chief; but the court ruled, subject to exception, that such evidence would be proper in rebuttal, and the government evidence was put in at that stage. The ruling was right. No doubt Chance's ability to run went to the identity of the man seen running, but there are many possible questions on the elements of the case which the government must prove, concerning which it may rest on general presumptions until specific evidence is introduced tending to show that this is an exceptional case. It must show that the defendant did not do the act by reason of insanity, but it is not obliged to call experts in the first instance to show that the man was sane. Trials would be made even more unnecessarily long than they are if all possible defences of this sort had to be met in advance without waiting to see whether they are set up. Most men can run. That was enough until the jury had some ground for believing that Chance did not fall under the general rule. Of course the fact that the government had reason to expect the evidence which was offered in defence did not affect its duties. It had a right to wait until the expectation was fulfilled. Whether an exception could be maintained upon this matter we need not consider, as in our opinion the court took the proper course.

7. Evidence was offered by the defence and excluded, subject to exception, that one Mrs. O'Brien, since dead, during a quarrel with her husband, went to a closet, took out two bullets and said, " The third one killed Russell." Seemingly it was argued that the evidence showed grounds for suspecting Mrs. O'Brien's husband, and that her declaration was admissible under St. 1898, c. 535. The statute was met by the judges, who were not satisfied that the declaration was made in good faith and upon personal knowledge. It now is argued that the evidence was admissible as part of the *res gestæ.* But it was no part of any material fact or act. Assuming that the presence

of the bullets in the closet had some infinitesimal bearing upon the case, which is going far, the fact that Mrs. O'Brien rather than some one else took them out was immaterial except on the assumption that the declaration was material, which is the very thing to be proved. If her taking out the bullets were material, still the declaration would not be made admissible by that fact, but would have to stand on its own merits, which are not enough. The act of taking out the bullets needed no explanation and was not explained, in any material sense, by Mrs. O'Brien's words. It is not the law that any and all conversation which happens to be going on at the time of an act can be proved if the act can be proved.

8. A witness testified that she had seen O'Brien wearing an overcoat like the one produced which belonged to Chance and was found in what was supposed to be the path of the murderer's flight. The witness did not identify the coat or in any way fix the time when she saw O'Brien wearing one like it. She was asked what O'Brien said at the time. It does not appear what the answer was expected to be. We find it hard to imagine anything which would have been material and admissible. O'Brien was alive, so that the statute mentioned above did not apply. Presumably, what he said was mere hearsay. If it had been a confession, still the cases have held that the general rule against hearsay applies. *Commonwealth* v. *Chabbock*, 1 Mass. 144. *Farrell* v. *Weitz*, 160 Mass. 288. 6 Am. & Eng. Encyc. of Law, (2d ed.) 573, *sub v.* "Confessions." If anything admissible was expected it should have been shown. *Honsucle* v. *Ruffin*, 172 Mass. 420.

9. The defendant Chance seems to have presented an unreasonable number of requests for rulings. The thirty-seventh is brought before us. It was given in substance by the court, except that the court did not use the phrase "abiding conviction amounting to a moral certainty," as explanatory of the obligation of the government to prove its case beyond a reasonable doubt. This matter has been disposed of with what but for this case would seem almost superfluous amplitude in *Commonwealth* v. *Costley*, 118 Mass. 1, 23–25.

10. The last exceptions argued are to the refusal to give in terms the instructions asked with regard to the definition of

murder and malice aforethought. " Malice," it was said, " means intent to kill or do grievous bodily harm." If there was such precedent intent, the request went on, " the homicide is murder. If there is no precedent intent, there is no murder." The court went farther in favor of the defendant rather than less far, although it did not use the words of the request. After defining murder in the usual way, it went on to state that malice " means the state of mind which prompts the conscious violation of law to the prejudice and injury of another." It " is intended to denote an action flowing from any wicked and corrupt motive." The court then said that homicide " may be manslaughter when done by a rash and wanton act without malice; or it may be with purpose and intent to do the unlawful act of killing accompanied by malice aforethought, and then it is murder. It is with the latter charge of murder that we have here to deal." So that on the whole the jury were led to suppose that an actual intent to kill unlawfully was necessary to the offence of murder. The defendant cannot complain. If it had been necessary the jury properly might have been instructed that it is possible to commit murder without any actual intent to kill or to do grievous bodily harm, and that, reduced to its lowest terms, malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification. " The criterion in such cases is to examine whether common social duty would, under the circumstances,.have suggested a more circumspect conduct." 1 East, P. C. 262. *Commonwealth* v. *Pierce*, 138 Mass. 165, 178. Of course we do not mean to imply that such a likelihood would be enough to satisfy the statutory requirement of deliberately premeditated malice aforethought, and to constitute murder in the first degree.

It is suggested that the instructions asked would have excluded the possibility of the jury's finding that the offence was murder because committed in the attempt to commit an offence punishable with imprisonment for life, whereas, it is argued, the offence must be murder on other grounds, and then is raised by the supposed concomitant to murder in the first degree. Pub. Sts. c. 202, § 1. The applicability of this suggestion appears to

us wholly fanciful, but the suggestion itself is opposed to the most authoritative statements of the common law, which recognize that an accidental homicide may be made murder if it occurs in the course of an attempt to commit a felony. *Rex* v. *Plummer*, J. Kel. 109, 111, 117. *Regina* v. *Barrett*, Steph. Dig. Crim. Law, art. 223, p. 146, n. 4. Foster, Crown Law, 258. Although the proposition has received severe and well known criticisms, among others from Lord Macaulay in the notes to his draft of a penal code for India, it would be hard to overrule it in view of the section of the Public Statutes to which we may have referred. Certainly we have no occasion to do so in this case.

*Exceptions overruled.*