FITTER et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. May 14, 1919.)

No. 214.

1. CRIMINAL LAW ⬅1129(2)—APPEAL—ASSIGNMENTS OF ERROR.
   The record should not be burdened with dragnet assignments of error the purpose of the rule requiring assignments of error being to enable the court and opposing counsel to see on what points reversal of a judgment is sought and to limit discussion to those questions.

2. CRIMINAL LAW ⬅718—TRIAL—ARGUMENT.
   Language that might be permitted to counsel in summing up a civil action cannot with propriety be used by a public prosecutor, who is a quasi judicial officer, and whose duty it is to act in the interest of justice; so where a prosecuting attorney's appeal for a conviction is upon considerations which have no legitimate bearing on the case, and which the jury have no right to consider, a conviction should be reversed unless it is apparent that no possible harm has resulted.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. CRIMINAL LAW ⬥1171(1)—APPEAL—HARMLESS ERROR—ARGUMENT.**

In a prosecution for conspiracy to defraud the United States, argument of counsel for the United States, in so far as it appealed for a conviction on improper grounds, *held* harmless, in view of the overwhelming evidence of defendant's guilt.

**4. SEARCHES AND SEIZURES ⬥7—WITNESSES ⬥298—PRIVILEGE OF ACCUSED—UNLAWFUL SEARCHES.**

Under Const. Amend. 4, declaring against unreasonable searches and seizures, and Amend. 5, declaring that no person shall be compelled to be a witness against himself, it was an arbitrary and unlawful violation of defendant's constitutional rights for officers of the secret service to demand from his wife ledgers and delivery slips for use as evidence in a prosecution for conspiring to defraud the United States, and, where the wife delivered the same on demand, such documents are inadmissible in evidence.'

**5. CRIMINAL LAW ⬥1166(1)—APPEAL—CONVICTION—HARMLESS ERROR.**

Though a seizure of defendant's ledgers without warrant was a violation of the rights guaranteed by Const. Amends. 4, 5, a conviction will not be reversed where neither the ledgers nor their contents were admitted in evidence, and witnesses were not allowed to testify as to information derived therefrom, etc.

**6. CRIMINAL LAW ⬥1165(1)—HARMLESS ERROR—EVIDENCE—VIOLATION OF CONSTITUTIONAL RIGHTS.**

Though the seizure of defendant's ledgers and books was an invasion of his rights guaranteed by Const. Amends. 4, 5, the introduction in evidence by defendant of the only pages in the ledger examined by the United States Attorney cured the error, if any existed, based on their having been for a time in the custody of government agents.

**7. CRIMINAL LAW ⬥730(1)—CONDUCT OF COUNSEL—ACTION OF COURT—HARMLESS ERROR.**

Where it was doubtful whether the jury heard an alleged improper remark by the prosecutor, who consented that it should be stricken, and the court instructed them if they heard it to disregard it, the error was harmless.

**8. WITNESSES ⬥48(1)—COMPETENCY—CONVICTION OF CRIME—WITHDRAWAL OF PLEA OF GUILTY.**

It was the judgment of conviction of an infamous crime which at common law made the convict incompetent as a witness; hence defendant cannot complain that two of those indicted with him who had pleaded guilty were allowed to withdraw their pleas and permitted to testify, though they had confessed themselves guilty of a felony.

**9. WITNESSES ⬥48(1)—COMPETENCY—CONVICTS.**

The testimony of persons convicted of crime is admissible in the federal courts, and the conviction goes simply to the credibility and weight of their testimony.

**10. WITNESSES ⬥52(1)—COMPETENCY—TESTIMONY OF WIFE FOR HUSBAND.**

In a prosecution for conspiring to defraud the United States, the fact that the trial court declined to allow defendant's wife to testify, on the ground that the competency of witnesses in a criminal case is governed by the common-law rules in force when Judiciary Act 1789 was passed, is no ground for reversal.

**11. CRIMINAL LAW ⬥520(1)—EVIDENCE—CONFESSIONS.**

In a prosecution for conspiring to defraud the United States, confessions made by alleged coconspirators to a naval intelligence officer, who stated that it was the best thing for such persons to tell the truth, cannot be excluded as involuntary where no inducements were held out.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

12. CRIMINAL LAW ⊚⇒368(1), 423(1)—EVIDENCE—ACTS AND DECLARATIONS OF COCONSPIRATORS.

Where two or more persons were associated for the same illegal purpose, any declaration or act of one of the persons in reference to the common object is admissible, when they are in furtherance of the common object or constitute a part of the res gestæ.

13. CRIMINAL LAW ⊚⇒780(4)—INSTRUCTIONS—ACCOMPLICE'S TESTIMONY—CORROBORATION.

In a prosecution for conspiring to defraud the United States, where the jury had been charged that the testimony of confederates and accomplices should not be accepted unless corroborated, a further charge that the confessions of such confederates might be considered as corroboration was improper, allowing the confessions of his alleged co-conspirators which were not in furtherance of the conspiracy to be used against defendant.

In Error to the District Court of the United States for the Eastern District of New York.

John Fitter and others were convicted of conspiring to defraud the United States, and the named defendant alone brings error. Reversed.

O'Gorman, Battle & Vandiver, of New York City (George Gordon Battle and Rogers B. Wood, both of New York City, of counsel), for plaintiff in error.

James D. Bell, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith, Sp. Asst. U. S. Atty., of counsel), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The plaintiff in error, hereinafter called the defendant, was indicted with five others for having conspired to defraud the United States. They were all tried together, and all were found guilty. The defendant Fitter was sentenced to imprisonment at Atlanta for one year and nine months and to pay a fine of $5,000.

[1] He alone has sued out a writ of error, and there are 62 assignments of error, which occupy 12 printed pages of the record. We think this a good occasion to call attention of counsel to what the Supreme Court has said on several occasions in reference to the practice of burdening the record with dragnet assignments of error. In Phillips & Colby Construction Co. v. Seymour, 91 U. S. 646, 23 L. Ed. 341, the assignments of error were 10 less than the number found in this case, and the court said:

"The object of the rule requiring an assignment of errors is to enable the court and opposing counsel to see on what points the plaintiff's counsel intend to ask a reversal of the judgment, and to limit the discussion to those points. This practice of unlimited assignments is a perversion of the rule, defeating all its purposes, bewildering the counsel of the other side, and leaving the court to gather from a brief, often as prolix as the assignments of error, which of the latter are really relied on. We can only try to respond to such points made by counsel as seem to be material to the judgment which we must render."

In Central Vermont Ry. Co. v. White, 238 U. S. 507, 35 Sup. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252, the court recurred to the subject again, quoting from the earlier case which we have cited.

The practice condemned is not conducive to the better administration of the law, and embarrasses, rather than promotes, the cause of justice.

The defendant at the time the alleged conspiracy was formed was a dealer in supplies and provisions in the borough of Brooklyn. Two of his codefendants were employés of the United States in the service of the Navy Department at the City Park Barracks in Brooklyn, where it was their duty to examine and check incoming supplies purchased by the United States government for delivery at the City Park Barracks, and to issue receipts for the provisions and supplies, and to report the amount of the same to the paymaster in the United States Navy Yard so that he might be informed of the payments proper to be made by him from the funds of the United States in his custody. Three other of the codefendants were employés of the defendant, whose duty it was to drive the defendant's trucks.

The conspiracy alleged was that defendant should agree to sell and deliver provisions and supplies to the United States for the use of the Navy Department, and that only a part of such provisions and supplies should be actually delivered, and that it should be made to appear by the issuance of false receipts that such provisions and supplies had been delivered and were in the possession of the department.

Two of the codefendants who were in the service of the Navy Department, and who had issued false receipts showing the delivery of greater quantities of butter, eggs, meat, and poultry than were received, pleaded guilty and gave testimony on behalf of the government. The alleged method which the conspirators adopted was for the defendant to have the correct quantity of provisions brought to the Navy Yard on defendant's trucks, and then, after receipts had been issued purporting to show the delivery of the entire quantity, the drivers were permitted to carry back to defendant's store substantial portions of the supplies for which receipts had been issued. Three other codefendants, drivers of Fitter's trucks, confessed to the frauds perpetrated, and their sworn confessions were introduced in evidence at the trial.

The testimony in the case, if the jury believed it, certainly proved by overwhelming evidence the guilt of the defendant. The government claims that it not only proved its case beyond a reasonable doubt, but proved it beyond any possible doubt.

[2, 3] The defendant seeks a reversal, and he raises certain objections to the indictment, and to rulings of the court, and to parts of the summing up of the attorney for the prosecution. In a case where the evidence of guilt is so overwhelming, the objections of the defendant must be serious and clearly prejudicial to justify the court in reversing the judgment and compelling the government to put this man again on his trial.

The defendant mainly relied in his effort to obtain a new trial upon certain remarks addressed to the jury by the Assistant United States Attorney in his summing up. The remarks complained of are the following:

"You have got your duty to do, and I have got my duty to do, and your work is just as sacred and just as dear to your country as the man who is

over in France to-day and fighting that fight from the front; that it would be unworthy for me to mention the name of my country and your country in' the prosecution of this case. I do not think he meant that, because he is a better American than that. Why, this contract, gentlemen, that is distinctly a war contract. This, gentlemen, is a contract that was founded and entered into for the only purpose of helping us in the prosecution of this great world war"—

At this point counsel objected, and a colloquy between counsel ensued, and at its close counsel for the government resumed, saying:

"Gentlemen, these facts are given you for your consideration so that you may, in your integrity and upon your oaths as jurymen, do your duty as you see it. We who are not on the battle-lines are here in this country enjoying peace: enjoying all those liberties that only men who are allowed to do business and make a profit while the war is going on on the other side; but I say to you, gentlemen, woe be to the vulture that uses as his carrion the profits derived by illegal sale of the government's goods."

Here counsel for defendant renewed his objection on the ground that it was an appeal to the passion and prejudice of the jury. Then followed another short colloquy between counsel, and counsel for the government appealed to the court that he be permitted to draw his own inferences of the ·testimony that had been adduced. Whereupon the court observed:

"Gentlemen, you will so understand."

And counsel for defendant excepted.
Later on in his argument counsel for the government said:

"Gentlemen, this does hurt, I know; but I want it to hurt. I want it to go right down to the heart of these men. I want them to feel it as I feel it, gentlemen. Think of your children now trying to sell Thrift Stamps as my children and some of your children are, stopping people on the highways to help in the successful prosecution of this great war. Think of you. Think of me. Think of these men in the courtroom, going to their theaters or places of amusement to-night, and listening to some speaker to-night asking them to buy Liberty Bonds, and think of some thief that would steal the money that you put into that Liberty Bond in order to make the war a success, and ask yourselves the question: Is this prosecution under these circumstances just, and have I the right to expect a verdict in this case of guilty as charged in the indictment? What is the country, gentlemen? Is the country that we live in—is it these buildings; is it the shores of California, with its wonderful, velvety grass; is it the mountains; is it the material that we use to fight the terrible Hun with and barbarian; is it the guns; is that our country? Why, no. You are what we call our country. The men in the courtroom. The human beings that go to make this country what it is. That is your country. I tell you that when men violate this law at this time, and they come before twelve honest, intelligent jurors, and we give them the fair trial that they have had, we give them everything that they are entitled to. We say, this shall not continue, because it is the wrong, thieving crime that will hinder or delay the uplift of a great world and make it a better place to live in, and must be stamped out in its inception; and let us say as we leave the courtroom tonight that no contractor in this district, or anybody that does business with the government, will do it hereafter, except on the level, because we are going to make our verdict ring true and clear in the ears of every contractor."

Counsel for defendant again interposed on the ground that it was an appeal to the prejudice and passion of the jury, and he asked for

the withdrawal of a juror on the ground that the jury may have been prejudiced. The court denied the motion, and an exception was taken.

The court in instructing the jury charged:

"I expressly charge you that you are to disregard any remarks of counsel made throughout the trial, or during the summing up, so far as they may affect your verdict, because your verdict can only be reached upon the evidence itself as presented at the trial."

On the argument in this court counsel asserted that the remarks were such as to preclude the possibility of a fair and impartial trial. It was also urged upon us as quite probable that the appeal to render a verdict from patriotic motives might have had a greater effect upon the jury than the evidence presented by the government.

In Dunlop v. United States, 165 U. S. 486, 498, 17 Sup. Ct. 375, 379 (41 L. Ed. 799), the Supreme Court, having under consideration certain remarks alleged to be improper and which were made by counsel in his address to the jury, said:

"There is no doubt that, in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused. In such cases, however, if the court interfere, and counsel promptly withdraw the remark, the error will generally be deemed to be cured. If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation."

There are numerous cases in which courts have deemed it necessary to set aside verdicts because of prejudicial and improper remarks made by counsel in arguments addressed to juries. We shall not undertake to refer to them even by mere citation. We may observe, however, that the courts have said that language might be permitted to counsel in summing up a civil action which could not with propriety be used by a public prosecutor, who is a quasi judicial officer representing a state or the United States, as the case may be, and whose duty it is to act impartially in the interest only of justice. People v. Fielding, 158 N. Y. 542, 547, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495. Prosecuting attorneys should be careful not to depart from their line of duty, and it is the plain duty of the trial court not to allow an appeal to be made to a jury for a conviction upon considerations which have no legitimate bearing upon the case and which the jury would have no right to consider. And where this duty has not been performed it is the plain duty of the appellate court to set aside the judgment unless it is convinced that no possible harm has resulted.

In Chadwick v. United States, 141 Fed. 225, 245, 72 C. C. A. 343, 363, Judge Lurton, speaking for the Circuit Court, said:

"There is a degree of liberty allowable to counsel, whether for the government or the accused, in respect to the line of argument they shall pursue and the inferences to be drawn from the evidence, which a trial judge should respect until the facts of the case are overstepped or arguments used which plainly abuse the privilege. But when facts not in evidence are stated to the jury or arguments advanced plainly not justified by the evidence, and calculated to arouse prejudices incompatible with even-handed justice or an orderly

course of procedure, it is the right and privilege of the counsel for the accused to object and ask the interference of the court, and to except when the court denies the appeal. But to entitle the accused to a reversal when objection is made and the language not withdrawn, it must appear that the matter objected to was plainly unwarranted and so improper as to be clearly injurious to the accused."

He added:

"It cannot be seriously claimed that the argument and influence of counsel complained of were so grossly unwarranted and improper as to be palpably injurious to the accused. Unless this does appear, a reviewing court should not reverse upon such an assignment of error."

The language complained of in the case now before the court is certainly no more objectionable than that complained of in Diggs v. United States, 220 Fed. 545, 555, 136 C. C. A. 147, 159. In that case the Circuit Court of Appeals in the Ninth Circuit declared that they discovered nothing "so offensive or inflammatory in the remarks of counsel for the government as to require us on that ground to reverse the judgments."

The cases show that a prosecuting officer, while he may not appeal either to the fears or the vanity of a jury, and so seek to coerce or cajole them into a verdict of conviction, and in this case he did neither, may legitimately appeal to them to do their full duty in enforcing the law. In so far as counsel went beyond that legitimate appeal we are not inclined upon this record to say that the defendant was prejudiced so that the verdict should be set aside. If the evidence of guilt was less overwhelming, and any possible and reasonable doubt of guilt existed, there would be better reason for asking the court to reverse; but, in view of the evidence which we find in the record, we do not deem it proper, in the due administration of criminal justice, to reverse the judgment on the ground assigned.

[4] The defendant claims that he was forced to furnish incriminating evidence against himself, and that he has been convicted upon evidence secured in an unlawful and illegal manner and in violation of his constitutional rights. It appears that, acting under instructions given by the United States Attorney or his assistant, an officer belonging to the United States secret service came to the defendant's place of business in the absence of Fitter, and demanded that Fitter's wife allow him to examine the ledger, delivery slips, receipts, and check books. This demand was complied with, and certain slips and papers were taken away. An hour later an automobile drove up, and two men entered the store, one of them wore a naval uniform, the other one said he was a secret service agent. They entered the back office and called for "Ledger, ledger, contract ledger." Mrs. Fitter at that time was working on the ledger. The man in uniform grabbed the ledger and carried it out of the store. And as the two left, one of the men said he was going to bring the ledger back after comparing it with the delivery slips. Mrs. Fitter did not see the delivery slips, papers, and contract ledger again, however, until she saw them in the office of the United States Attorney on November 27, 1917.

On November 14, 1917, four days after the illegal seizure of the defendant's ledger and papers, the United States Attorney for the

Eastern district of New York was requested to return the ledger, and an offer was made to preserve the ledger in its then condition. No attention was paid to this request, and the ledger was not returned.

Thereafter, and before the trial of this action, a motion was made for the return of the ledger, papers, and slips which had been unlawfully seized, and by direction of the court the ledger and some of the papers were turned over by the United States Attorney to counsel for the defendant.

Neither of the men who examined the defendant's books and papers had a search warrant authorizing them to examine or to seize either the books or the papers. The testimony of the officers is that no forcible seizure was made, but that a request was made which was acceded to by Fitter's wife. What was done was undoubtedly an arbitrary and unlawful violation of Fitter's constitutional rights. The Fourth Amendment of the Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fifth Amendment provides, inter alia, that no person—

"shall be compelled in any criminal case to be a witness against himself."

[5, 6] The defendant relies upon Flagg v. United States, 233 Fed. 481, 147 C. C. A. 367, which was decided by this court. Flagg was arrested charged with having devised a scheme to defraud and with using the mails in furtherance thereof. At the time of his arrest all the books and papers at his place of business were seized by the federal authorities, who retained them in their possession for several years notwithstanding the accused made demands for their return. The papers at last were returned but in the prosecution of Flagg secondary evidence gleaned from the seized documents was received in evidence. This court reversed the conviction on the ground that as the seizure of the papers was illegal, being without warrant, the evidence derived therefrom was incompetent against the accused, and that a conviction based thereon should be reversed. And in Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, the court unanimously held it to be reversible error to admit in evidence documents which had been obtained by a marshal without a search warrant.

If the facts in this case brought it within the principle of the Flagg and Weeks Cases it would be clearly the duty of this court to follow the doctrine they announced. But this case is clearly distinguishable from those to which reference has been made. And we are not inclined to extend the doctrine of those cases to the facts of this. The illegal acts of subordinate agents of the United States should not afford to the clearly guilty a means of escape from a just punishment unless conviction has been secured through the use of documents or other evidence containing self-incriminating matter obtained

by illegal means. That has not been done in this case. The papers and book which the officials of the government took into their possession were not used at the trial by the government or in preparation therefor. The only pages in the ledger examined by the United States Attorney were two, and those were put in evidence by the defendant. Their introduction in evidence by the defendant cured any error, if any existed, based upon their having been for a time in the custody of the government's agents. Finnegan v. United States, 231 Fed. 561, 567, 145 C. C. A. 447.

In the case at bar the trial judge was very particular that no evidence should be received which was derived by the government from any paper or book which the government had taken into his possession by the illegal "seizure." This appears very clearly throughout the trial, but we will refer to but one passage, which sufficiently shows the care of the trial judge in this respect:

"The Court: None of the testimony that you have given, I take it, is based upon information which you acquired from papers seized by the government from the defendant Fitter; is that so?

"The Witness: None whatsoever.

"The Court: Either directly or indirectly; and none of the papers that you produced are papers taken by the government in that way?

"The Witness: None whatever. All are from our own files.

"The Court: At this time I will be very careful to cover this fully with each witness, and I have also instructed the district attorney not to offer any evidence of that sort. Will it not be possible during the rest of the trial for you, or your associate, to direct the attention of the court to any testimony of this sort which you think is being given; otherwise I shall have to caution each witness.

"Mr. Battle: I think, your honor, it would be safer to caution each witness.

"Mr. Beer: At the conclusion?

"The Court: I think it would be better to do so in the beginning, and I shall be obliged to any of you gentlemen to call that to my attention."

Attention is also called to the instruction given to one of the officials of the government, who was one of the officers who was engaged in the seizure of the books. When he was called to the stand to testify the court said:

"Now, Ensign Fitzgerald, you have been called by the United States government to testify at this prosecution against Fitter and others on trial. Some time ago the authorities of the government seized certain books and papers, property of Fitter, and the court directs attention to your testimony. If you acquired any information as the result of any examination you may have made of these papers, or any information that you may have learned indirectly as the result of the contents of those papers, you are to omit all such testimony during your examination.

"The Witness: I see, sir."

And the United States Attorney stated that the book and papers which the government officials illegally took into their possession were of no value in the prosecution of the case and in procuring the necessary evidence.

[7] It appears that during the examination of a witness the counsel for the government asked defendant's counsel whether he had slips which the witness on the stand referred to. The extract from the record follows:

"Mr. Beer: Have you got those slips?

"Mr. Wood: We object to the District Attorney calling upon the defendant to produce slips, and take exception to it.

"Mr. Beer: I will consent to it being stricken out, and ask the court to disregard the remark at this time.

"The Court: I did not hear the remark. If any juryman heard it, I instruct them to disregard it. The District Attorney has withdrawn it.

"Mr. Wood: The defendant excepts, and insists that the exception go on the record."

The defendant's counsel appears at the trial to have made much of a remark which the court had not heard and which it is doubtful if any member of the jury had heard. In view of the fact that the counsel for the government at once withdrew the remark, and that the court immediately cautioned any juryman to disregard it if he heard it, we do not regard the occurrence as one which would justify a reversal. The circumstances are such as to plainly distinguish the case from McKnight v. United States, 115 Fed. 972, 977, 54 C. C. A. 358, where the demand for the production of an incriminating document was made by counsel for the government acting by direction of the trial judge, and where there was no direction to the jury to disregard the error. The Circuit Court of Appeals in that case said very properly that the compulsory production of a criminating document by the accused when on trial for crime is compelling him to testify against himself within the meaning of the Fifth Amendment to the Constitution.

[8, 9] It is objected that Will and Goodman, who were jointly indicted with Fitter, and were placed on trial with him, but at the opening of the trial withdrew their pleas of guilty, should not have been permitted to testify, having confessed themselves guilty of felony. The common-law rule made a person incompetent as a witness who had been convicted of an infamous crime. In 40 Cyc. 2207, the rule is laid down that "It is not the guilt, but the judgment thereon, which disqualifies the witness; and therefore a person who has not been sentenced is competent, although he has been found guilty of felony, or has pleaded guilty to a charge thereof," citing the cases. And in the case at bar the two witnesses complained of had pleaded guilty, but had not been sentenced at the time their testimony was received. Moreover, the rule in the courts of the United States since Rosen v. United States, 245 U. S. 467, 38 Sup. Ct. 148, 62 L. Ed. 406, was decided, makes the testimony of persons convicted of crime admissible, and the conviction simply goes to the credibility and weight of their testimony.

[10] It is also objected that error was committed in excluding the testimony of Fitter's wife, who was called to give evidence for the defense. The common-law rule made husband and wife incompetent as witnesses for or against each other in either civil or criminal proceedings. In some of the states the disqualification arising from the relation of husband and wife has been removed by statute, but no statute has been passed on this subject by Congress. In United States v. Reid, 12 How. 361, 13 L. Ed. 1023, the court held that the competency of witnesses in criminal trials in United States courts

must be determined by the rules of evidence which were in force in the respective states when the Judiciary Act of 1789 (Act Sept. 24, 1789, c. 20, 1 Stat. 73) was passed. In Rosen v. United States, supra, the court concluded that "the dead hand of the common-law rule of 1789 should no longer be applied" to exclude the testimony of convicted felons. It may perhaps be said with equal reason that "the same dead hand" should no longer disqualify husband and wife except as respects confidential communications. If the trial judge had permitted Mrs. Fitter to testify, this court would not readily have been inclined to hold that error had been committed. But this judgment of conviction certainly cannot be set aside because the court still adhered to the rule of the common law.

We come now to the consideration of what we regard as the most serious questions which the case presents. The defendant objects to the admission in evidence of confessions alleged to have been made by three of the defendants. This testimony is objected to on the ground that the confessions were obtained by inducements held out by those in authority, and so were not voluntary. It is also objected that the admissions of co-conspirators which are alleged to have been made after the conspiracy came to an end were received in evidence.

[11] The prosecution claims that the confessions were voluntary and that they were not made after the conspiracy was concluded. The evidence that they were not voluntary is based on what was said by one Fitzgerald, an ensign attached to the Naval Intelligence of the United States Navy at the Navy Yard in Brooklyn, and who was questioning the defendants concerning their connection with the alleged offense. The conversation took place prior to their arrest. Fitzgerald's testimony was that he said to defendant Will that Goodman had made a confession implicating himself and Will, and "I want your story from you and the best thing you can do is to tell me the truth." Then he went over to the Navy Yard and found Prager. He told him that he had a couple of confessions that he had been delivering short weights at the City Park Barracks, and that he wanted to have a talk with him. They went into one of the buildings at the Navy Yard, and Fitzgerald testified he said, "Prager, if you have been delivering the stuff at the direction of Fitter, you know the best thing you can do for yourself, is to come across." Prager confessed. Then Wittholm was brought in, and the officer said: "Wittholm, we have a confession of George C. Goodman and the chief commissary steward at the City Park Barracks to the effect that they have been receiving money from John Fitter for accepting shortages at the City Park Barracks. Prager has just admitted to me that he delivered goods to the City Park Barracks at the full amount of the consignment signed for, whereas he knew that he only delivered part of it, and you better come across and tell us the truth also, as we know you have been implicated in it." The court asked him to repeat what he said to Wittholm, and his version then was "the best thing that you can do is to tell the truth. You will make it just that much easier for yourself to tell the truth." We think that the evidence shows that Fitzgerald was mistaken in saying that

he used the words, "You will make it just that much easier for your-self to tell the truth," as will appear as we proceed. Then Katz was brought in and informed that Goodman and Will had confessed and had implicated him, and "we want you to tell the truth; come across and tell the truth." An officer who was attached to the Naval Intelligence Bureau, and who was present at the conversations above detailed and heard them, denied positively that Fitzgerald, who questioned Prager, told him that he "had better come across and tell the truth; it will be easier for you." And he testified that to the best of his knowledge what was said was, "Tell the truth."

Goodman on cross-examination was asked whether Fitzgerald said to Prager, "You had better come across; it will be easier for you." He replied: "I don't remember 'easier.' He said the best thing to do would be to come across and tell the truth." Goodman also testified that he had received no promises from any one.

An assistant paymaster in the navy, who was present when Fitzgerald talked with Prager, testified that he did not hear him say, "You better come across; it will be much easier for you if you do." It is quite unimportant whether the words, "You better come across," were used; for the evidence disclosed that it was a slang expression, meaning to tell the truth.

The defendant Will testified at the trial that no promise whatever had been made to him, and that he did not confess until after he and defendant Goodman had talked the matter over between them, and concluded to make a statement to the United States Attorney a week before the trial began.

The civil and common law regarded differently the question of the admissibility of confessions in evidence. The civil law assumed that an innocent person would not confess to the commission of a crime he had not committed. It therefore regarded confessions as evidence of the most satisfactory kind, and as conclusive evidence of guilt in all cases not capital, unless there was overwhelming proof to the contrary. Domat's Civil Law, § 2086. But the common law took quite a different view of the subject, and was disposed to regard confessions with distrust. At one time the courts in England, as Sir James Fitzjames Stephen in his History of the Criminal Law of England, vol. 1, p. 447, points out, "were disposed to take almost any opportunity to exclude evidence of confessions, almost anything being treated as an inducement to confess. In 1852, however, the law was considerably modified by the decision in the case of R. v. Baldry, 2 Den. 430, since which time the disposition has been rather the other way." The English rules of evidence, incumbered as they originally were with what Stephen calls "all manner of irrational matter," excited the indignation of Bentham, who thought that all objections to evidence ought to be objections, not to its admissibility, but to its weight. And his influence has had much to do with the modification of these rules in England.

In this country our courts have been inclined to take a more liberal view of the subject of confessions than the English courts took.

In Hopt v. Utah, 110 U. S. 574, 584, 4 Sup. Ct. 202, 207 (28 L. Ed. 262), the court, speaking of the admissibility of confessions, said:

"While some of the adjudged cases indicate distrust of confessions which are not judicial, it is certain, as observed by Baron Parke in Regina v. Baldry, 2 Den. Cr. Cas., 430, 445, that the rule against their admissibility has been sometimes carried too far, and in its application justice and common sense have too frequently been sacrificed at the shrine of mercy."

In Commonwealth v. Chance, 174 Mass. 245, 249, 54 N. E. 551, 553 (75 Am. St. Rep. 306), the court, speaking through Chief Justice Holmes, held certain conversations between an accused person and a police officer voluntary and properly received in evidence, and said:

"We have no disposition to make the rule of exclusion stricter than it is' under our decisions. It goes to the verge of good sense, at least."

The rule in regard to the admission of confessions is stated by the Supreme Court in Bram v. United States, 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, as follows:

"But a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * *

"A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted. * * *"

The question, therefore, is whether the testimony already referred to must be considered as amounting to such an inducement or improper influence as should have caused the trial court to exclude the confessions from evidence. We think this question must be answered in the negative.

In Wharton's Criminal Evidence (Ed. 1912) vol. 2, p. 1344, § 647, it is said that "a mere adjuration to speak the truth does not vitiate a confession, when neither threats nor promises are applied."

The same authority in volume 2, § 654, p. 1358, states the law as follows:

"As to admonitions to tell the truth, even where coupled with the statement that to tell the truth is best, it has been held in this country that the confession is voluntary; but in England the words, 'You had better tell the truth,' seem to have acquired a sort of technical meaning, importing a threat or a benefit. As anomalous as it may seem, the explanation is that, while the accused is advised to tell the truth, he supposes that what the authorities mean is that he is to say that he is guilty, and this, coupled with the statement that it would be better to tell the truth, furnishes the temptation to make an unworthy statement, hence an involuntary confession. In this country, however, the weight of authority is that an inducement cannot be implied from the mere exhortation that it is better, or is best, to tell the truth, nor under the advice that if the accused is guilty a confession could not put him in any worse condition, and that he had better tell the truth at all times."

In Sparf & Hansen v. United States, 156 U. S. 51, 55, 56, 15 Sup. Ct. 273, 39 L. Ed. 343 (1895), the accused was told that when the right time came to "tell the truth." And the Supreme Court said

that "this was not offering to the prisoner an inducement to make a confession. Littledale, J., well observed in Rex v. Court, 7 Car. & P., 486, that telling * * * the truth is not advising him to confess anything of which he is really not guilty. See, also, Queen v. Reeve, L. R. 1 C. C., 362."

In Lucasey v. United States, Fed. Cas. No. 8588a, decided in the Circuit Court for the District of Columbia in 1852, the accused was told "it would be better for him to tell the truth," and thereafter he told where the stolen property was. The court, over objection, had admitted the evidence, and the judgment of the trial court was affirmed. It does not appear whether the person who told the accused that it would be better for him to tell the truth occupied any official relation.

In Hintz v. State, 125 Wis. 405, 104 N. W. 110 (1905), the sheriff said to the prisoner: "You might as well tell the truth, Charlie. I think it would be better for you." The prisoner said: "Do you think it would do me any good?" And the sheriff replied: "I think the truth is always the best." The confession was held properly received. In Roszczyniala v. State, 125 Wis. 414, 104 N. W. 113 (1905), the inspector said to the accused, "You better tell the truth about this matter;" and it was held the confession was admissible.

In Huffman v. State, 130 Ala. 89, 30 South. 394 (1900), the officer who arrested the defendant said to him: "If you have stolen the cotton, it will be better for you to tell the truth about it." The court held that this did not render the confession involuntary and inadmissible. And the court cited a number of Alabama decisions to the like effect.

In State v. Habib, 18 R. I. 558, 30 Atl. 462 (1894), an accomplice said to the accused, who was under arrest: "It's no use trying to get out of it; they've got us dead; we have all been arrested, and you might as well tell the truth." The accused then confessed, and his confession was held properly received in evidence.

In State v. Nagle, 25 R. I. 105, 54 Atl. 1063, 105 Am. St. Rep. 864 (1903), a statement made to the mittimus officer by one accused of murder while in custody on the way to jail was held to have been improperly admitted in evidence and to constitute reversible error. The statement was made after the officer had told her that "the truth, whatever that might be, ought to be told; that it was always the best, except where it would be the means of conviction, and that even then he should prefer it if it were his case; * * * that there was ample proof that" the accused had bought the revolver, "and that, having mentioned the place where she bought it, she might just as well say whether or not she bought it." While the court held the admission in evidence of what the woman said was under the circumstances reversible error on the ground that her statement was not voluntary, it declared that "we do not wish to be understood in what we have thus said, however, as deciding that a mere request, advice, or admonition to tell the truth will render a confession induced thereby inadmissible in evidence; for the strong current of authorities, as well as the better reason, is to the contrary. * * * Those

decisions which have gone to the extent of so holding have certainly gone 'to the verge of good sense, at least.' But where the request or admonition is given in such language and under such circumstances that the prisoner might naturally have understood it as recommending a confession, the confession induced thereby will be inadmissible in evidence."

In State v. Kornstett, 62 Kan. 221, 61 Pac. 805 (1900), the court held that mere advice or admonition to the accused to speak the truth, which does not import a threat or benefit, will not render a confession then given incompetent.

In Rizzolo v. Commonwealth, 126 Pa. 54, 17 Atl. 520 (1889), a subordinate detective told the prisoner that "he had better tell the captain all he knew; that it would be better for him." Later the captain told him: "If you have anything to tell me, in God's name tell me the truth; if not, tell me nothing. * * * I can make you no promise; I cannot even ask you to tell me a word; but I tell you now, anything you say to me I shall use against you. * * *" The confession received under these circumstances was held properly admitted in evidence.

In State v. Anderson, 96 Mo. 241, 249, 9 S. W. 636, 639, the court held a confession admissible, saying that confessions are inadmissible which are forced from the defendant by flattery of hope or torture of fear, adding: "But mere adjurations to tell the truth furnish no ground for excluding them. State v. Hopkirk, 84 Mo. 278." In the Anderson Case the accused was told by one of his guards: "Ed, if you are innocent, stick to it; if guilty, acknowledge it, and it will probably go easier with you."

In State v. Meekins, 41 La. Ann. 543, 6 South. 822 (1849), the court sustained the admissibility of a confession, saying: "The bill discloses nothing impairing the free and voluntary quality of the confession. Neither threat nor promise was made, but it was given on the simple advice of the officer that 'he had better tell the truth.' "

In Heldt v. State, 20 Neb. 493, 30 N. W. 626, 57 Am. Rep. 835, a detective in the guise of a friend told a suspected party that he had consulted an attorney, who said: "He [the prisoner] had better tell the facts of the case and that they would be likely to do him as much good as anything he could do, and that there was no use lying about it, and he had better tell the truth," and the court held the confession admissible.

In State v. Staley, 14 Minn. 105 (Gil. 75) (1869), the court held that a confession made in answer to a question assuming the guilt of the person confessing, or which was obtained by artifice, falsehood, or deception, or procured by a caution to the accused to tell the truth, if he said anything, did not render a confession inadmissible. It was declared that "unless there is a positive promise of favor, made or sanctioned by a person in authority, or the inducement held out is calculated to make the confession an untrue one, I think it may be laid down as a rule based on reason, and deducible by the late authorities, that the confession will be admissible."

The fact that the confessions were made by defendants while they

were in the naval prison is emphasized by counsel as a matter of consequence in determining the admissibility of the confessions. These men were not at the time under arrest, and were not in a cell or in the prison proper, but in a room used for hospital purposes. In Sparf & Hansen v. United States, supra, counsel contended that a confession could not be voluntary if made while a defendant is imprisoned and in irons under an accusation of having committed a capital offense. The court held otherwise, saying: "We have not been referred to any authority in support of that position." And "confinement or imprisonment is not in itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary, and was not obtained by putting the prisoner in fear or by promises."

In Wilson v. State, 19 Ga. App. 759, 769, 92 S. E. 309, 313, the court said: "Telling a prisoner that it will be better for him to tell the truth can hardly, by any process of right reasoning, be interpreted as an invitation to him to make an untrue confession."

[12, 13] We come in conclusion to inquire whether there was error in admitting in evidence the confessions of the codefendants. The general rule was stated in American Fur Co. v. United States, 2 Pet. 358, 365 (7 L. Ed. 450), Mr. Justice Washington speaking for the court. He said that, "where two or more persons are associated together for the same illegal purpose, any act or declaration of one of the parties in reference to the common object, and forming a part of the res gestæ, may be given in evidence against the others." So in Wiborg v. United States, 163 U. S. 632, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289, the court declared that the declarations must be made in furtherance of the common object, or must constitute a part of the res gestæ of acts done in such furtherance. And as this court held in Erber v. United States, 234 Fed. 221, 228, 148 C. C. A. 123, admissions or confessions made after a conspiracy is at an end cannot be received as against a coconspirator. In this case confessions made after the conspiracy was at an end were received in evidence for the purpose indicated in the court's charge to the jury, which was as follows:

"Now, gentlemen, you have also to consider that proof has been offered by the government that the defendants Goodman, Katz, Prager, and Wittholm have made so-called confessions of their participation in this alleged conspiracy; and while the confessions themselves are only to be received by you as evidence against the defendant himself for making the confessions, so far as the confession is concerned, nevertheless the court charges you that that confession is some corroboration of the testimony given by the defendants Will and Goodman where it applies thereto; and it is for you to determine whether there has been produced by the government, and offered in evidence, sufficient corroboration to satisfy you that the testimony given by the defendants Will and Goodman is correct, and that the guilt of the defendants has been established beyond a reasonable doubt."

To so inform the jury, and then immediately add that the confessions might also be used as some corroboration of the testimony given by Will and Goodman, was inconsistent and confusing. The jury had been told that the testimony of Will and Goodman, being the testimony of confederates and accomplices, should not be accept-

ed unless corroborated. And then they were informed in the portion of the charge above set forth that the confessions might be accepted as some corroboration of the two witnesses, Will and Goodman. This was permitting the confessions to be used against Fitter.

And as the conspiracy was at an end when the confessions were made, they could not be so used. The objection to their admission in evidence was properly taken at the time and the error requires a reversal.

Judgment reversed.