## FINNEGAN v. UNITED STATES.

### (Circuit Court of Appeals. Sixth Circuit. April 14, 1916.)

### No. 2749.

1. POST OFFICE ☞48(4)—OFFENSES—INDICTMENT—USE OF MAILS TO DEFRAUD.

An indictment under Penal Code (Act March 4, 1909, c. 321), § 215, 35 Stat. 1130 (Comp. St. 1913, § 10385), which charged that the scheme for which the mails were used was one to defraud divers ignorant persons in three named states, especially Austrians not familiar with business, without naming them or stating that their names were unknown to the grand jurors, is sufficient, since it shows that the scheme was to defraud, not an individual, or group of definite individuals, but a class, which was described as particularly as possible.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 72; Dec. Dig. ☞48(4).]

2. INDICTMENT AND INFORMATION ☞71—SUFFICIENCY—CERTAINTY.

The highest degree of certainty is not required in an indictment, but certainty to a common intent is sufficient.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 144, 174, 193, 194; Dec. Dig. ☞71.]

3. POST OFFICE ☞48(4)—OFFENSES—INDICTMENT—USE OF MAILS TO DEFRAUD.

An indictment charging the use of mails to defraud, which alleged that the plaintiff sold stock of a certain corporation, of which he was not the agent, and which stock he did not intend to deliver, and converted the amount paid therefor to his own use, and that the corporation had ceased to do business, and none of its stock was for sale, was not defective for failing to allege that the defendant had knowledge that the corporation had ceased to do business, since the fraud was complete if defendant agreed to sell the stock, intending to convert the money to his own use, and not to deliver the stock.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 72; Dec. Dig. ☞48(4).]

4. INDICTMENT AND INFORMATION ☞63—SUFFICIENCY—FORM OF AVERMENT—"AS AFORESAID."

Where an indictment for using the mails to defraud in the first two paragraphs set out the fraudulent scheme, and in the third paragraph alleged, "And so the grand jurors do further present as aforesaid," setting out the particular means whereby an individual was defrauded, the word "so" was surplusage, and the words "as aforesaid" refer to the manner in which the additional matter was presented, there being no invariable rule which refers those words to the last or any antecedent word or averment, and they did not render the indictment bad, as showing that the third paragraph was an argumentative conclusion by the grand jurors, and not a direct allegation.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 185; Dec. Dig. ☞63.

For other definitions, see Words and Phrases, First and Second Series, As Aforesaid.]

5. INDICTMENT AND INFORMATION ☞119—SUFFICIENCY—FORM OF AVERMENT—SURPLUSAGE.

If those words could not be so construed, they were surplusage, since no prior mention had been made of the fact charged in the third paragraph.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 311–314; Dec. Dig. ☞119.]

**6. POST OFFICE ☞48(4)—INDICTMENT—USE OF MAILS TO DEFRAUD—DESCRIPTION OF LETTER.**

An indictment for the use of mails to defraud, which specified the sender of the particular letter charged to have been received in furtherance of the fraudulent scheme, the place of mailing, the contents, the amount of the post office order contained therein, the addressee and his post office address, the payee of the money order, and the date on which he took it from the post office, sufficiently described the letter; a post office money order being so well known as not to require a more particular description.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 72; Dec. Dig. ☞48(4).]

**7. POST OFFICE ☞48(8)—VARIANCE—USE OF MAILS TO DEFRAUD—"LETTER."**

There is no variance between an indictment under Penal Code, § 215, for using the mails to defraud, which charged that defendant took a "letter" from the post office, and proof that he took an envelope which contained only a post office money order, since "letter," as used in that statute, is a comprehensive term, and includes such a communication.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 78; Dec. Dig. ☞48(8).

For other definitions, see Words and Phrases, First and Second Series, Letter.]

**8. POST OFFICE ☞49—OFFENSES—EVIDENCE—TAKING FROM POST OFFICE.**

In a prosecution for taking from the post office a letter in furtherance of a scheme to defraud, contrary to Penal Code, § 215, evidence that an envelope containing a post office money order duly stamped and addressed to defendant was deposited in a post office and forwarded in the mails, and that on the following day the same money order was presented by defendant at the post office to which the letter had been addressed and payment therefor receipted by him, is sufficient to show that he took the letter from the post office.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.]

**9. CRIMINAL LAW ☞730(3)—MISCONDUCT OF PROSECUTOR—EVIDENCE BY DEFENDANT—CURE BY COURT.**

Where the prosecuting attorney, in a prosecution for using the mails with intent to defraud, offered in evidence all of defendant's letters to his agent prior to the termination of the agency, whereupon the defendant asked that the subsequent letters be introduced also, the remark of the prosecuting attorney that he would do so if the defense would produce the letters the prosecution had asked them for was not erroneous, as seeking to compel the defendant to produce as evidence against himself the letter charged to have been received in furtherance of the scheme to defraud, where the court, on defendant's exception to the remark, negatived such inference.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1693; Dec. Dig. ☞730(3).]

**10. POST OFFICE ☞49—OFFENSES—EVIDENCE—USE OF MAILS TO DEFRAUD—INTENT.**

In a prosecution for the use of the mails in furtherance of a fraudulent scheme to contract to sell corporate stock with intent to convert the proceeds and not to deliver the stock, evidence held sufficient to warrant the jury in finding that defendant did not intend to purchase the stock in the market and deliver, and did not by mistake offer that stock for sale, instead of stock which he or his wife then owned.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.]

**11. CRIMINAL LAW ☞1169(1)—HARMLESS ERROR—ADMISSION OF EVIDENCE.**

Where defendant was charged with using the mails in furtherance of a fraudulent scheme to sell stock of a mining corporation which had ceased

to do business, and there was proof that the defendant had represented that there was such a corporation, the admission of parol evidence to establish the existence of that corporation was not prejudicial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3137; Dec. Dig. ☞1169(1).]

12. CRIMINAL LAW ☞670—ERROR—PRESENTING QUESTIONS BELOW—OFFER OF EVIDENCE.

Error cannot be predicated on the refusal of the court to admit evidence in a prosecution for using the mails in furtherance of a fraudulent scheme to sell stock not owned by defendant and to convert the proceeds, because in response to a question by defendant's counsel whether the court would permit defendant's brother-in-law to testify to conversations with defendant relative to a sale of stock by him, or his intention in that respect, the court replied that he would not, since the proposition submitted to the court was too indefinite.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 757, 1593–1596; Dec. Dig. ☞670.]

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

P. H. Finnegan was convicted of using the mails to defraud, and he brings error. Affirmed.

W. Knox Haynes and Michael Feinberg, both of Chicago, Ill., for plaintiff in error.

Myron H. Walker, U. S. Atty., and H. Dale Souter, Asst. U. S. Atty., both of Grand Rapids, Mich.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SATER, District Judge.

SATER, District Judge. Finnegan, the defendant below, was indicted, convicted and sentenced under section 215 of the Penal Code, for using the mails to defraud. He prosecutes error to obtain a reversal of the judgment against him.

The first paragraph of the first count, the only one on which he was convicted, charges that, on or about January 31, 1911, at Calumet, Mich., he devised the following scheme to defraud "divers other persons": He and his agents personally and through the mails and by printed circulars and other advertising matter would falsely and fraudulently represent to "such persons" in various localities in Michigan, Wisconsin and Minnesota that he was the agent of the Kelvin-Arizona Copper Company, the owner of a rich and valuable copper mine near Kelvin, Ariz., duly authorized to sell and deliver its stock, and that he and his agents would solicit orders for the stock "among ignorant persons, especially Austrians not familiar with business," would receive and accept orders from "such persons" for stock, enter into written contracts with "such persons" for its purchase and for the delivery of certificates therefor in six months from the date of such contracts, would secure from "such persons" the money in payment for the same, and would solicit and induce "such persons" to open correspondence with him at Calumet and forward to him there through the mails money orders for the purchase of such stock and remittances for the same, merely intending to get possession of the moneys to be sent to

him and to convert the same to his own use, without giving anything of value therefor, and without delivering to "such persons" any certificates of stock of such company or of any other mining corporation, and thereby to defraud the "said persons" who should send and pay money to him. The second paragraph of the count alleges that the Kelvin-Arizona Copper Company was not engaged in business in 1910, having practically withdrawn therefrom in 1907, and had no stock for sale; that Finnegan was not its agent, was without power or authority to sell or deliver its stock, and did not intend to deliver certificates for the same, but intended to convert and did convert to his own use "the moneys received from persons with whom he made contracts" and intended to defraud and did defraud "said persons" out of the same by means of his scheme. The third paragraph alleges, "And so the grand jurors do further present as aforesaid" that on or about the date named the defendant, in the execution of his scheme to defraud, took from the post office at Calumet a certain letter addressed to him at that place, sent by mail from Rumely, Mich., by Jacob Pesek, which letter contained a post office money order for the sum of $7 payable to the defendant at Calumet, "contrary to the form of the statute," etc.

[1] The several grounds on which the count was assailed by demurrer are pressed on the court with great earnestness. It is not defective, as claimed, in averring a scheme to defraud "divers other persons," without naming or describing the persons whom it was intended to defraud, or giving a lawful reason for not so doing, or stating that the names of such divers other persons are to the grand jurors unknown. The indictment differs from that considered in Larkin v. United States, 107 Fed. 697, 46 C. C. A. 588 (C. C. A. 7th Cir.), on which case the defendant mainly relies. In that case the scheme alleged in the indictment was to defraud "divers other persons" by inducing "those persons severally" to send to the accused divers valuable articles to defraud "the several persons" who should send the same, which scheme and artifice he intended to effect by opening correspondence and communication with "the several persons" so intended to be defrauded and by inciting "those persons" to open communication with him. The court rightfully said:

"These expressions clearly import an intention to defraud different individuals, with whom it was intended to open correspondence, and who, therefore, by the settled rule of pleading, should have been described by name in the indictment, or a good and true reason given for the omission."

[2] In the instant case, the names of the parties to be injured were not known to the defendant when his scheme was originated and were not capable of definite ascertainment by the pleader. The purpose was to defraud a class—"ignorant persons and especially those of Austrian nationality, not familiar with business," who might be found in any of the three states named. The case therefore falls under the rule stated in the Larkin Case that, where the charge is a scheme to defraud a class, not resolvable into individuals, it is evident that the persons intended to be injured were not known and no necessity therefore existed for an averment to that effect. A pleading is not faulty

whose form of allegation is unavoidable. The highest degree of certainty is not required, certainty to a common intent being sufficient, and no rule ought to prevail which would only serve to shield the guilty, instead of protecting the innocent. Bishop, New Crim. Proc., §§ 493, 497; Stoughton v. State, 2 Ohio St. 562, 564.

[3] We are further of the opinion that there is no merit in the insistence that the count did not charge the defendant with knowledge that the Kelvin-Arizona Copper Company practically ceased to do business in 1907 and was doing none at all in 1910. The second paragraph of the count is in part a repetition of what is elsewhere well pleaded and the residue is superfluous. Its entire omission would not weaken the government's position. If, as charged, the defendant intended to get possession of the moneys paid to him and convert them to his own use without giving anything of value in return, it is altogether unnecessary to aver that the company had gone out of business practically or entirely and that he had knowledge of that fact. If such purpose existed, the criminality of the scheme was present, whether he was the agent of the company or not, and regardless of whether it was in or out of business, or had or had not stock for sale and delivery.

[4, 5] The contention that the third paragraph of the indictment, by reason of the presence of the words "so" and "as aforesaid" occurring in the expression, "And so the grand jurors do further present as aforesaid," is a mere recital and an argumentative conclusion that, from the preceding averments, the defendant is guilty of the crime named in the recital, and is not an affirmative averment of the use of the post office establishment—a constituent element of the offense—and that therefore the count is void and does not support the jurisdiction of the court, is not sound. The presence of those words in the count does not vitiate it. "As aforesaid" is an adverbial referential expression, meaning "in the manner aforesaid," "in like manner," and indicates the manner in which the grand jury further presents an additional element of the offense. Stroud's Jud. Dict. vol. 1, p. 52. If the alleged vitiating words "as aforesaid" be retained and be not treated as surplusage, and their equivalent be used and the clearly superfluous word "so" be rejected, the opening statement of the third paragraph becomes reasonably clear, and the same as if it averred that the grand jurors do further present, in the aforesaid manner, or in the same manner as they have heretofore presented given facts, certain other facts, naming them. Following such opening statement are allegations of fact not previously made, the affirmative character of which allegations and the context must be considered. There is no invariable rule which refers the words "aforesaid" or "as aforesaid" to the last or any antecedent word or averment, if so to apply them would be at variance with the context (Anderson's Law Dict. 913; Healy v. Healy, 9 Irish Rep. Eq. 418 [1875]), and they may be wholly rejected as surplusage (Campbell v. Bouskell, 22 Beav. 325; Commonwealth v. O'Hearn, 132 Mass. 553, 555). In the Campbell Case, the word "aforesaid," occurring in the expression "aforesaid nephews and nieces," none having been previously named, was re-

jected. So in the present instance, no prior mention having been made of the facts charged in the third paragraph, the words "as aforesaid" should be rejected as surplusage, and thus we prefer to dispose of the objection to the count based on their use. Without them the paragraph distinctly charges an essential element of the offense. Rightfully interpreted, it thus charges with them present.

[6] Nor is the count defective for want of a sufficiently particular description of the letter taken by the defendant from the Calumet post office. It specifies the sender, the place of mailing, the contents, the amount of the post office money order, the addressee and his post office address, the payee, and the date on which he took the letter from the post office. So well known, even among the laity, are such money orders, that a more detailed description of the money order in question would have been superfluous. The count adequately apprised the defendant of the nature and cause of his accusation and sufficiently conforms to the rules of criminal pleading to withstand successfully the assaults made upon it.

[7] It is urged that proof that the defendant received an envelope sent through the mails, as charged, containing the money order in question is not proof that he took a letter from the mail; that is to say, that an envelope containing a money order only is not a letter. The court charged to the contrary. Section 215 was designed for the instruction and protection of the common people. The word "letter" occurring in the statute is a comprehensive term. An envelope properly stamped and directed, containing a money order only, payable to the addressee, is, according to the popular understanding and in law a letter. It may be written or printed, or partly written and partly printed, as is usually the case with money orders. The post office money order was quite as much an epistolary communication, and quite as well understood by the defendant as it would have been, had the sender specifically written that a post office money order was inclosed. There was no variance in the proof, as claimed, or error in the charge of the court in the respect mentioned.

[8] The evidence shows that on January 30, 1911, Jacob Pesek bought at Rumely a money order for $7, payable to the defendant at Calumet. He inclosed it in a stamped envelope, which had previously been furnished by and was addressed to the defendant, and returned it in that condition to the postmaster, who put it in the mail box. The mail from such box was subsequently taken up and sent on its course. On the day following that same money order was presented at the post office at Calumet by the defendant, at which time he receipted for its payment and received the money on it. Pesek had bought of the defendant on September 30, 1910, 100 shares of stock of the Kelvin-Arizona Copper Company (par value $1 per share) for $35, of which $7 were paid in cash, and the residue was to be paid in four equal monthly installments of $7 each. A certificate for the stock purchased was to be delivered by the terms of the contract within six months from its date, or as soon thereafter as payment in full was made. Pesek had been instructed to transmit money for the unpaid installments as they matured, by money order, registered letter, or

express money order, to the defendant at Calumet. He never had any transaction with the defendant, other than the purchase of the stock. In view of the foregoing facts the asserted variance in the proof as to the receipt by the defendant of the letter named in the indictment does not exist. His possession of the money order and his realizing and receipting for its full value support the conclusion that he took from the post office at Calumet the letter which was mailed at Rumely and transmitted through the mails to the former place.

[9] The defendant in September, 1910, employed Louis Lustick as his agent to assist him in the sale of stock. The relation of principal and agent was maintained until about April 1, 1911, within which period of employment many letters relating to the sale of stock and the business in hand passed between them. The district attorney undertook to offer in evidence all of the defendant's letters to Lustick, believed to be relevant, down to the last-named date, regarding, however, all letters subsequent to that date as immaterial. On cross-examination of the post office inspector, it appeared that certain letters written after April 2d had not been produced or offered by the government. Defendant's counsel thereupon requested the production of all such letters, with which request the district attorney offered to comply, providing the defendant's counsel would produce "the letters we have asked you for." Exception was taken to this response on the ground that the district attorney had made "a demand in the presence of the jury upon this defendant to produce evidence," an inference which the court promptly negatived. The district attorney then remarked that he had served notice upon his opposing counsel "to produce certain letters," to which the defendant excepted. Subsequently the defendant's counsel again asked that the government's counsel produce all letters in his possession written after April 2d. They were then produced, and all letters subsequent to that date that passed between the defendant and Lustick were submitted by the defendant to the jury. The defendant, who did not take the witness stand, charges that reversible error exists, in that the jury might have reasonably inferred that the letter or letters mentioned in the discussion were taken by him from the post office and were in his possession, and that a demand was made on him in the presence of the jury to produce evidence to be used against himself. This contention cannot be sustained. The subsequent admission of all these letters at the defendant's instance devitalizes his exception, if it ever possessed merit. The trial judge understood, and we think made it clear to the jury, and the record shows, that the letters mentioned did not include the one named in the indictment, or any of an incriminatory character, and were only those written after Lustick's employment had fully terminated, and after the alleged offense charged in the indictment had been fully consummated. The defendant's position is no better than that of the respective defendants in Foster v. United States, 178 Fed. 165, 173, 101 C. C. A. 485, and Bettman v. United States, 224 Fed. 819, 823, 140 C. C. A. 265, both of which cases were decided by this court.

[10] Notwithstanding the defendant's assertions to the contrary, we are not prepared to say that the government failed to prove its case. He employed Lustick, an Austrian who could speak and write English,

to assist in effecting sales to his fellow countrymen. Together they visited camps and localities in the states named in the count where Austrians were assembled, many of whom could use no language other than that of their native country. At other times Lustick was sent alone to such places to make sales. No particular individuals were in contemplation, but Austrians as a class were sought out and solicited. Evidence was given to them as to the ownership of the mine by the company, the company's freedom from debt, the great quantity and richness of its ore (a sample being displayed for that purpose), the mine developments in progress, the limited number of shares for sale, the quite positive representation that the shares which he sold at first at 35 cents and later at a higher price would in a short time sell for $1 and would even be worth $2 each, and the delivery of stock to purchasers about May 1, 1911. Purchasers were invited to communicate with him by mail, and were furnished for that purpose with envelopes having his name printed thereon. On different occasions at different places affirmatively by word of mouth, and in other instances by necessary implication arising from circulars distributed by mail and otherwise, he represented, when effecting or attempting to effect sales, that he was selling stock for the Kelvin-Arizona Copper Company, or in other fitting language held himself out as its agent for such purpose. The applications for stock in evidence signed by purchasers recite the purchase of stock of that company. No instance is cited, and we find none, in which he stated that he was selling stock for himself. The applications which purchasers signed recite, it is true, that they purchased stock from defendant, and on his letter heads beneath his name were the words "Stocks, Bonds and Securities," but these things were not necessarily inconsistent with his declared existence of an agency and the jury were at liberty so to find. His sales of stock were in small blocks and aggregated about 20,000 shares. He was never agent for and never owned any stock of the Kelvin-Arizona Copper Company and could not sell any of its stock for himself, for the reason that it was never sold on the market and was owned exclusively by the few persons who in or about Los Angeles, Cal., promoted the company. It practically ceased to do business in 1907 and was doing none whatever in 1910. He never delivered or attempted to deliver even so much as a single share to any one of his purchasers.

In so far as the record indicates, he owned but 41 shares of mining stock, and that was in the Sultana-Arizona Copper Company and of the face value of $5 per share. He exhibited his certificate for these shares sometimes, at least, in his efforts to obtain purchasers. His wife owned about 2,366 shares in the same company. He had been agent for that company, but on April 28, 1910, it went out of business and its property was taken over by the newly organized Arizona-Sultana Copper Company, notice of which reorganization and of the change of corporate name was given to every stockholder of the old company at that time. The new company gave 5 shares of its stock, of the face value of $1 each, for each of the shares of its predecessor company (excepting about 9,000 shares held in small lots which were not turned in for exchange), withdrew from the market the stock so given in exchange, and escrowed it until May, 1911, and, on account

of extensions to November, 1911, May, 1912, and November, 1912, did not release its stock, until the last-named date. The defendant knew of the exchange of stocks and of the escrowing of that of the new company. It is not shown what he did with the money he received from sales, or that he purchased, or took any steps towards purchasing for delivery, any of the stock of the new company, or any stock of its predecessor for the purpose of exchanging it and of delivering the stock received in exchange, or that he exercised any dominion over the stock held by his wife, or attempted or intended to utilize it in making stock deliveries. The stock held by him and his wife was other than that of the Kelvin-Arizona Copper Company and was in the aggregate much less than the quantity he sold. The greater part, perhaps all, of his wife's stock later passed into the possession of others, subsequent to the reorganization of April 28, 1910, and of the notice given of the same. He was in possession of blank applications for the purchase of stock of the Kelvin-Arizona Company, as early as June, 1910. The use of such blanks in making sales continued down to March 18, 1911.

But there is also evidence to show that at some time within the period of Lustick's employment—it may have been December, 1910—the defendant caused blank applications to be printed and subsequently used them in part for the sale of the stock of the newly organized company. He was not, however, at any time its agent. He also exhibited in soliciting subscriptions a plat of the Sultana-Arizona Copper Company, the representation being made that the property shown on it was that of the Kelvin-Arizona Company, that the name shown on it was that of the old company, and that the name of the mine whose stock he was selling was Kelvin-Sultana. He also gave out letters containing somewhat glowing accounts of the last-named mine, its rich deposits of ore, its progressing developments, and its excellent prospects of great profits to those who invested in its stock. The Diamond Joe shaft, a cut of which was exhibited, was represented to be on the property of all of the three companies.

A more extended résumé of the evidence would unduly prolong this opinion. Enough has been shown to indicate its trend and some of the problems with which the jury had to wrestle. It was claimed for the defendant below, as here, that he intended no wrongdoing, that he was confused as to the names of the companies, that the use of the name of the Kelvin-Arizona Copper Company was merely an error which he attempted to correct, and that it was his purpose at that time to deliver the stock which he in fact intended to sell, but improperly designated. On the other hand, the government has at all times claimed that he was not a novice in the handling of stocks, that the use of the name of the newly organized company and that of its predecessor was an afterthought, designed to impair the force, and afford escape from the consequences, of his wrongful use of the name of the Kelvin-Arizona Copper Company, and that if he intended to correct a mistake he would have wholly abandoned the use of the blanks he first employed and notified his purchasers of his original error. The jury adopted the government's theory. It must have considered that he sold, and, with knowledge of the correct names of all of the companies mentioned,

continued to sell, the stock of a company which he never represented, of which stock he never owned and never could acquire a single share. There was presented also the improbability of his taking orders and receiving payment for stock at a price much less than he would be required to pay for shares to meet his contract, if his representations as to the future value were true or believed to be true, and if he intended to substitute or furnish for the stock he sold that of another company—a thing which he could not do without the consent of the purchasers. Considering the evidence as a whole and the presentation of the case to the jury in the charge of the court, in which we find no hurtful error, if there be any at all, we are not prepared to say that the scheme to defraud was not proved as alleged or that the jury obtained the wrong result.

[11] We do not regard the introduction of parol evidence as to the corporate existence of the Kelvin-Arizona Copper Company as prejudicial error. Such existence was not in issue. The allegation is and the proof shows that the defendant represented that there was such a corporation. The evidence of a competent and informed witness discloses that there was a concern of that name which undertook to develop mining property at Kelvin, Ariz., and that its enterprise failed. Whether that concern was a corporation real or de facto, or some other sort of entity, is immaterial.

[12] Error is assigned to the exclusion of evidence, especially that of the witness Walsh, a brother of the defendant's wife, which it is claimed was offered to show the absence of a wrongful intent. There is no evidence in the record to warrant the claim that the defendant attempted to buy stock or borrow money for that purpose to fulfill his obligations to his purchasers. His wife bought her stock with money which she had borrowed, and repaid it. It does not appear that either she or her husband ever contemplated the delivery of any part of it to any of the defendant's purchasers. In answer to the query of his counsel, Would the court permit the witness Walsh to testify to any conversations between himself and the defendant during the winter of 1910, and the years 1911 and 1912, as to any sale of stock made by him or his intention "in that respect?" the court answered in the negative. If the error alleged exists, it is within that narrow compass. The proposition submitted to the court was so indefinite and so wanting in particularity that error may not be predicated upon it.

The many other assignments of error have been considered, but a review of them is deemed unnecessary. The judgment of the District Court is affirmed.