## SCHAUBLE v. UNITED STATES.
### No. 8697.

Circuit Court of Appeals, Eighth Circuit.
April 16, 1930.

E. B. Silvers and E. H. Wright, both of Kansas City, Mo. (M. E. Casey, of Kansas City, Mo., on the brief), for appellant.

S. M. Carmean, Asst. U. S. Atty., of Kansas City, Mo. (William L. Vandeventer,

U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and DAVIS, District Judge.

VAN VALKENBURGH, Circuit Judge.

Appellant was indicted and convicted for fraudulent use of the mails under section 215 of the Criminal Code (18 USCA § 338). The indictment contained seven counts, and conviction resulted upon each count. The court imposed sentences of fine and imprisonment, the terms of imprisonment to run concurrently. The indictment is too long for repetition here. In general it charges that appellant had devised a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent representations, pretenses, and promises, from a certain class of persons then residents in divers states of the United States; that is to say, "from the persons whom said defendant should, by the means hereinafter described, induce to send and pay their money and property to said defendant, under the name of Investors Daily Guide, for the purchase of so-called 'Advance Guarantees,' 'Decline Guarantees' and 'Spread Guarantees' based on and relating to the fluctuation in price of grain, wheat, corn and oats in the future, and to convert said money and property to his own use without giving or intending to give to said persons to be defrauded anything of an equivalent value therefor, which said scheme and artifice was to be effected by the use and misuse of the Post Office establishment of the United States by said defendant himself, and by inciting, encouraging and causing other persons to enter into communication and correspondence with him by means of said Post Office establishment of the United States, said use and misuse of said Post Office establishment being a part of said scheme and artifice. * * * "

The indictment, in describing the scheme, alleges that appellant was to designate himself as manager of the Investors' Daily Guide, which was not incorporated, otherwise organized, nor having any legal entity, appellant being the sole owner, and person interested therein. That said Investors' Daily Guide should be held out as a regularly established, reputable, and substantial concern, of high business standing, financially responsible, and engaged in a legitimate business connected with operations in grain. By means of letters, circulars, and other printed matter, the public were to be advised that the Investors' Daily Guide dealt extensively in what were called "Advance Guarantees," "Decline Guarantees," and "Spread Guarantees," as a protection against futures and cash transactions; that such were traded in extensively by professional brokers and grain shippers, to whom they were profitable, and that, through the Investors' Guide, they might be equally available and profitable to outside traders, less experienced and less familiar with grain operations. The customer would pay to the appellant, through this so-called Investors' Guide, and through submanagers and employees designated by appellant, $12.50 for an "Advance Guarantee," or a "Decline Guarantee," and twenty-five dollars for a "Spread Guarantee." A "Spread Guarantee" includes both an "Advance" and a "Decline" in one contract. Upon receipt of the money appellant would issue to the patron a contract, usually effective for a seven-day period, and dealing with 10,000 bushels of grain. In this contract he agreed to pay the customer one cent per bushel for each cent the market fluctuated above the price specified in an "Advance Guarantee," or below the price specified in a "Decline Guarantee," during the contract period. Of course a "Spread Guarantee" covered both rise and fall in the same contract. This specified price, above or below which the market might fluctuate with profit to the customer, was fixed by appellant and was supposed to be set with respect to the market price on the day the contract was issued. Concerning this procedure, the indictment charges thus:

"Said defendant further planned as a part of said scheme and artifice that upon receipt of said money he would give to said person so remitting the same a memorandum receipt, confirmation or contract therefor, bearing the date of receipt of said money, and indicating that said person had purchased Advance, Decline or Spread Guarantees, any or all of them, as ordered in that particular transaction, and depending as to the amount of grain upon the amount of money sent to the defendant by said person; and he further planned under his said scheme and artifice that in said memorandum receipt, confirmation or contract, and therein only, he would arbitrarily fix the prices in said Advance, Decline and Spread Guarantees for each person so remitting money to him, so that such person would not know the actual Guarantee prices at which he was buying until he had forwarded his money and received said memorandum from the defendant so fixing said prices; and the defendant planned that such

arbitrary price in case of a purchase of an Advance Guarantee should be several cents above the market price of the grain on which said Advance Guarantee was purchased, and in case of the purchase of a Decline Guarantee then the price would be fixed several cents below such market price, and if a Spread Guarantee were purchased then he would fix such arbitrary prices several cents above and below such market price; and that said Guarantee prices so arbitrarily fixed by him as aforesaid, above and below said memorandum date market prices, should and would be fixed at a figure so far above and so far below said receipt date market prices, that there would be no probability of the market price fluctuating to such a point above or below the market price of the grain covered by said guarantees as would result in a profit to said person so to be defrauded."

The indictment further charges that in letters, circulars, or printed advertising matter, appellant would represent that "the market has only to move one cent beyond the price of your protection to afford you the chance of taking a difference of $100 on each 10,000 bu.; 2c, $200; 3c, $300; 4c, $400; 5c, $500, etc."; but that in the face of this statement a profit, if shown, would be limited to $200 on a $25 investment, and in that proportion.

As a part of the foregoing representation the following appears in one of the exhibits in large letters: "Your Cost is limited to $12.50 on each 10,000 bu. of wheat, corn or oats." In the same exhibit this statement appears: "We charge no commission, as this is covered in the price specified for Advance and Decline Guarantees when bought." It was the practice, however, in the rare cases in which a profit accrued, to charge a commission of one-fourth of 1 per cent. per bushel on the amount won, and a like commission for reinvesting or rebooking such earnings, all without the knowledge or consent of the customer, and to send him, in lieu of cash, a credit memorandum showing the balance placed to his credit on the books of the Investors' Daily Guide.

There are many other details of the fraud charged, but the foregoing will be sufficient to disclose its nature and scope.

Five points are urged and relied upon by appellant in brief and argument. They are:

(1) The court erred in overruling appellant's motion to quash the indictment and his motion for the return of certain papers and documents alleged to be the property of appellant, wrongfully in the possession of the government officers, and to have been used wrongfully in procuring the indictment.

(2) The indictment is fatally defective in that it fails to allege affirmatively the facts relied upon, but attempts to plead the facts by inference and recital.

(3) The evidence failed to prove the scheme charged. The indictment attempted to allege a scheme to defraud a specific class and there was no attempt to prove the existence of a class.

(4) The evidence failed to establish a fraudulent intent.

(5) The assistant United States attorney committed reversible error in his argument to the jury.

■ 1. The motions to quash and for return of papers, and the evidence taken upon these motions, all recite that prior to the returning of the indictment there was a hearing before a solicitor of the Post Office Department, representing the Postmaster General, on a charge that appellant had been using the mails contrary to statute, in connection with this business, the object being to determine whether a fraud order should issue as provided by law in such cases. Counsel for appellant made the following statement at the hearing on the motion to quash: "At the hearing on that charge before the United States Post Office Department, at the conclusion of the testimony for the government the defendant asked leave to come to Kansas City, and the defendant came to Kansas City to get some records pertaining to the various records, having an office here as well as an office in New York City. The matter was continued a few days for that purpose and he then introduced his records and files at that hearing. The records and files were used by the defendant in meeting each count and took them up by number, and the defendant used his records in explanation of the various matters under each count."

At the close of the hearing before the Post Office Department appellant's files, thus produced and used at that hearing, were left with the officers of the government—appellant claims at their request and upon their assurance that the papers would be returned to him as soon as an examination of the case, which was taken under advisement, was completed. The government attorney, in charge of the fraud audit department in Washington, testifies that these papers were left in his custody voluntarily by appellant, and that nothing whatever was said about their return. Later the papers were forwarded to the United States attorney at Kansas City, and it is charged that they were in part used before the grand jury in procuring this indictment. The

motion to quash was overruled. There are cogent reasons why this action of the trial court should be sustained. In the first place, the testimony fails to show that the documents in question were taken before the grand jury. We have not here presented a case in which it is charged and shown that no competent evidence was before that body. It is next apparent that the papers in question were voluntarily produced at the hearing before the Post Office Department, were marked as exhibits, and were there used by appellant in meeting each count of the charge against him. Whether the record shows that they were formally introduced is immaterial. They were papers in the case and so regarded. The promise to return them, if made, is likewise not controlling. By their tender and use at the former hearing, appellant made a "voluntary exposition" of them. There was no invasion of his privacy. The subject-matter of the hearing at which these papers were voluntarily produced was identical with that concerning which the grand jury inquired. We have been referred to no case which holds that the use of papers voluntarily surrendered violates either letter or spirit of the Fifth Amendment. As said by Mr. Justice McKenna, speaking for the Supreme Court, the controlling cases "make the criterion of immunity not the ownership of property but the 'physical or moral compulsion' exerted." Perlman v. United States, 247 U. S. 7, 15, 38 S. Ct. 417, 420, 62 L. Ed. 950.

2. We consider this second point wholly without merit. The indictment is perhaps unduly prolix, but it certainly does not fail to apprise the defendant of the offense with which he is charged. The holding of this court in Brown v. United States, 143 F. 60, is pertinent: "An indictment which states the essential elements of this offense, not merely in the general words of the statute, but with such reasonable particularity of act, intent, time, place, and circumstances as will, in view of the presumed innocence of the accused, apprise him with reasonable certainty of the nature of the accusation, to the end that he may prepare his defense, as will enable him to plead his conviction or acquittal as a bar to a subsequent prosecution for the same offense, and as will enable the court to say that the facts stated are sufficient in law to support a conviction, satisfies the rules of criminal pleading; otherwise it is insufficient."

Appellant's demurrer was properly overruled.

3. This specification asserts failure of proof in that the indictment charges a scheme to defraud a special class, to wit, those "unfamiliar with the operations of the grain market and inexperienced in dealing in grain future options," and that there was no attempt to prove the existence of such a class. The term "class" is used here only in a very general sense. In the nature of things it is not restricted to any well-defined body of men. It is obvious that the pleader intended by way of description to include all persons, who, through lack of experience and training, would be most likely to accept the aid of this "Guide" to safety and attractive profits. Such a "class" would embrace all but the sophisticated few, and would constitute, in effect, the public generally. However, if specific proof be needed it is circumstantially and sufficiently supplied by the record. Among those testifying to dealings with appellant we find two farmers, two painters and decorators, a clothing merchant, an insurance agent, a harness maker, a postmaster in a small town, a school janitor, and the present inmate of a fraternal home. We find neither departure nor failure of proof as claimed in this specification. Finnegan v. United States (C. C. A. 6) 231 F. 561.

4. Fraudulent intent rarely appears except by inference from facts and circumstances shown in evidence. There is in the record an abundantly sufficient showing of the intent and purpose to conduct this business by the means and in the manner stated. These operations were found to be fraudulent upon evidence which warranted that inference.

"The intentional use of a legal contract or transaction for the purpose of defrauding another may constitute a scheme or artifice to defraud, under section 5480, Rev. St. (U. S. Comp. St. 1901, p. 3696), although the use of the same contract or transaction with an honest intent for a proper purpose would be lawful and innocent." Miller et al. v. United States (C. C. A. 8) 133 F. 337.

5. The fifth specification of error is founded upon a remark of the assistant United States attorney in his closing argument to the jury, made in response to statements by counsel for appellant. The excerpts from these closing arguments, so far as material, follow:

"Mr. Wright (for appellant): There were 15 complaints out of all those that they have brought here. They have had Mr. Schauble's files since 1925; they have paraded them here

before this jury, and they have shown 15 complaints.

"Mr. Silvers (for appellant) : They have brought in certain evidence here. What is the evidence? They have brought in the testimony and the evidence of 15 transactions that he had. The evidence here disclosed that during the period covered by this evidence, the latter part of 1924 and the early part of 1925, that this office here, that he operated, had from 2,000 to 3,000 transactions with people. The evidence shows, as Mr. Wright has stated that the government has been in possession of his files, investigating this case, for almost 4 years before this trial came up, and with the possession of all of these files and all the evidence that the government had, and that other man from Chicago and their man from Washington and their Post Office Inspectors, they have found only 15 transactions they felt worthy to come in here and lay before you gentlemen of errors in the transaction of this business. I am not saying there might not have been others, but I am saying that the government, with all its facilities in the officials at Washington, and Post Office Inspectors and United States District Attorney during the last four years have found only 15 claimed errors to lay before you gentlemen.

"Mr. Carmean (for the government) : Gentlemen of the jury, the burden of complaint—counsel for the defendant seem to think that we haven't brought enough witnesses to this court room. It is not the purpose of the government to burden the court or the juries with innumerable witnesses. It is our purpose to furnish enough witnesses and enough complaints to give you gentlemen an idea of the transactions that you should pass upon. It is not because there are not more than 15 complaints. It is simply for the purpose of limiting the time and the expense of the court to what we think is a reasonable amount of testimony to establish what we allege in our indictment; and that is what we have done in this case, gentlemen of the jury; it is not because there are not numerous other complaints—

"Mr. Silvers: We object to that, Your Honor, that there are numerous other complaints.

"Mr. Carmean: Mr. Hassell testified to it.

"The Court: Just a moment. The statement of counsel that there were innumerable other complaints was a proper argument in answer to the argument of counsel for the defendant that the government has shown only a limited number of complaints. The objection is overruled.

"Mr. Silvers: We except.".

The Mr. Hassell referred to was attorney in charge of the fraud audit department in Washington at the time of the Schauble hearing before the Post Office Department, and had personal knowledge of all the proceedings there. In the District Court counsel for the government questioned him in detail with respect to the transactions specified in the indictment, and concerning the complaining witnesses produced at this trial. The following questions and answers are then recorded :

"Q. (by Mr. Carmean) Were there other files and documents submitted there at that time? A. There were.

"Q. Are these a portion of them here, just without designating them? A. I have examined those files there and they were all examined by the fraud audit hearing; three large bundles on the table."

This prosecution depended not upon the number of complaints made, nor whether any were made, but upon the nature of the scheme devised, and the presence of the fraud charged. That there were a great number of files submitted by those who had dealt with appellant appeared from the testimony. In such cases it is the practice to select a sufficient number to apprise the court and jury of the nature of the transactions, and to sustain the charges made. The introduction of a greater volume would unnecessarily congest and obstruct court proceedings, and would be intolerable. The remarks of counsel for appellant were calculated to produce a misleading impression on the part of the jury as to the significance of this limitation of witnesses, and we think the language of counsel for the government, thus provoked, under all the circumstances, and in the state of the record before us, did not constitute reversible error. It was unnecessary to show that any one had been actually defrauded, still less, that complaint had been made. Foster v. United States (C. C. A. 6) 178 F. 165.

It follows that the judgment should be, and is, affirmed.