## HYNEY v. UNITED STATES. *
### No. 5404.

Circuit Court of Appeals, Sixth Circuit.
June 30, 1930.

Rehearing Denied Nov. 14, 1930.

*Order staying mandate pending application for certiorari entered December 1, 1930.

135

Elvin Swarthout, of Grand Rapids, Mich. and J. Harold Mosely, of Chicago, Ill. (Denison, Watkins & White, of Chicago, Ill., on the brief), for appellant.

Edward J. Bowman, of Grand Rapids, Mich. (Louis H. Grettenberger, of Grand Rapids, Mich., on the brief), for the United States.

Before DENISON and HICKS, Circuit Judges, and HAHN, District Judge.

HICKS, Circuit Judge.

Hyney, president, Emerson, vice president, and Wilson, treasurer, of Hyney, Emerson & Co., a corporation, were indicted for a violation of section 215 of the Criminal Code (18 USCA § 338). A nolle prosequi was entered as to Emerson and Wilson. Hyney was acquitted upon the first count and convicted upon the remaining eleven. The indictment averred that the defendants had devised a scheme to obtain money by means of false and fraudulent representations made to a class of persons, some being particularly mentioned, who desired to purchase stock in corporations engaged in the business of buying and selling stocks and bonds. It also charged many and various representations as false and fraudulent elements of the scheme. We concern ourselves with only those deemed materially important, viz., that the corporation had among its assets stocks and bonds of the value of $617,224.67; that it had a surplus and profit to the amount of $186,340.15, and that it could on April 30, 1925, liquidate its business and have a balance left of $200,000. See Sasser v. U. S., 29 F.(2d) 76, 77 (C. C. A. 5).

There are one hundred and eighty-one assignments of error. We review here only those discussed in appellant's brief. Kahn v. U. S., 20 F.(2d) 782, 783 (C. C. A. 6).

(1) *Motion to Quash.*—The indictment is predicated upon the following clause of the statute, to wit: "Or shall knowingly

cause to be delivered by mail according to the direction thereon \* \* \* any such letter. \* \* \* " The principal complaint is that the indictment fails to aver, as applicable to all counts, that the letters or other communications had any directions thereon, as contemplated by the statute. The point is not well made. In each count the indictment, letter, or other communication is set out verbatim. The first count is illustrative of all. In addition to the copy of the indictment letter, the indictment fairly and substantially gives the defendant to understand that this letter was inclosed in a postpaid envelope and carried through and by the mails "to the post-office of address"; that it was addressed to J. M. Peterson, one of the persons intended to be defrauded, and "according to the address thereon" was caused by defendants to be delivered from a post office at Manistee, Mich. The insistence that the phrase in the indictment, "according to the address thereon," refers to the typewritten address on the letterhead of Hyney, Emerson & Co. on which the indictment letter to Peterson of April 7, 1925, was written, rather than to the address upon the postpaid envelope inclosing the letter, is not convincing. When thought of in connection with the post office establishment, the term "letter" signifies a communication inclosed, sealed, and stamped and being carried as first-class mail.

◼ It is insisted that the last clause of the statute, to wit, "or at the place at which it is directed to be delivered by the person to whom it is addressed," is ambiguous. A transposition of phrases would no doubt clarify the meaning of the clause, but the point is not involved here. The indictment is not predicated upon this clause.

There is no intrinsic merit in the objection that the indictment fails to aver that appellant or any defendant deposited in the mail any letter or circular. The indictment is drawn under that particular clause of the statute declaring it an offense to "knowingly cause to be delivered by mail according to the direction thereon \* \* \* any such letter, \* \* \* " and substantially followed this clause accompanied by allegations, indicated above, which seem to us sufficient to advise defendant of the specific offense with which he was charged. U. S. v. Hess, 124 U. S. 483, 8 S. Ct. 571, 31 L. Ed. 516; Moffatt v. U. S. (C. C. A. 8) 232 F. 522, 530; Moore v. United States (C. C. A. 7) 2 F.(2d) 839, and Freeman v. United States (C. C. A. 3) 20 F. (2d) 748, relied upon by appellant are not in point. They are evidently based upon other and distinct clauses of the statute.

◼ Nor is it necessary that the indictment aver that false pretenses, representations, or promises were actually made or intended to be made directly to any person or class of persons. It is sufficient to allege that defendant devised or intended to devise any scheme or artifice to defraud generally, and set forth only the names of the intended victims if known, or, if unknown, then the class of persons to be defrauded. U. S. v. Young, 232 U. S. 155, 161, 34 S. Ct. 303, 58 L. Ed. 548; Durland v. U. S., 161 U. S. 306, 313, 16 S. Ct. 508, 40 L. Ed. 709; O'Hara v. U. S., 129 F. 551, 554 (C. C. A. 6); Finnegan v. U. S., 231 F. 561, 564 (C. C. A. 6); McBryde v. U. S. (C. C. A. 6) 7 F.(2d) 466; U. S. v. Farmer (D. C.) 218 F. 929, 932.

◼ The objection that the first count of the indictment avers eight different schemes and artifices is without controlling merit. This objection is predicated upon the following averment in the first count of the indictment, to wit: "That before and at the several times of the commission of the several offenses hereinafter set forth, defendants had devised and did devise a certain scheme and artifice, etc." It is of course necessary that each count should embrace a distinct offense, but this may be accomplished by proper references in any one count to any other, as was done in this case, the first count referring to the dates of the different offenses as set forth in the succeeding counts and the succeeding counts incorporating by reference to the first count the artifice or scheme. Blitz v. U. S., 153 U. S. 308, 316, 14 S. Ct. 924, 38 L. Ed. 725; Foster v. U. S., 178 F. 165, 171 (C. C. A. 6).

◼ The indictment alleges that among other pretenses the defendant represented that the "corporation had among its assets stocks and bonds of the value of $617,-224.67"; that this representation was false "in this, that among the stocks and bonds included in the alleged assets of the corporation was a large amount, approximately $400,000.00 of stocks and bonds of but little if any real value." It is insisted that this description, to wit, "$400,000.00 of stocks and bonds" is not sufficiently particular. We do not agree. We think the clause sufficiently informative. The highest degree of certainty in an indictment is not required. Certainty to a common intent is sufficient. Finnegan v. U. S., supra; Tyomies Pub. Co. v. U. S., 211 F. 385, 389 (C. C. A. 6). Moreover the

element of false representations, not being the gist of the offense, need not be alleged with the certainty requisite in charging unlawful use of the mails. Colburn v. U. S., 223 F. 590 (C. C. A. 8); Savage v. U. S., 270 F. 14, 18 (C. C. A. 8).

(2) *Bill of Particulars.*—We cannot review the denial of the motion for a bill of particulars. This matter was in the court's discretion and there is no evidence of any abuse of it. Horowitz v. U. S., 262 F. 48, 49 (C. C. A. 2); Savage v. U. S., supra.

(3) *Motion for Directed Verdict.* —We do not consider the weight of the evidence. We review only the legal question whether the evidence was sufficient to support the verdict. If as a matter of law the evidence of every element of the offense is so substantial as to justify a verdict of guilty, if believed by the jury beyond a reasonable doubt, then the denial of the motion was proper; otherwise not. Pierce v. U. S., 252 U. S. 239, 251, 40 S. Ct. 205, 64 L. Ed. 542; Rosengarten v. U. S., 32 F.(2d) 644, 645 (C. C. A. 6); Fraina v. U. S., 255 F. 28, 34 (C. C. A. 2). It is not seriously urged that the representations and pretenses averred in the indictment were true in fact or that the appellant did not cause the indictment letters to be delivered by mail. The chief contention here is that the element of fraudulent intent was not sustained. Hyney, Emerson & Co., organized in 1917 as a partnership, became a corporation in July, 1922. It owned more than $300,000 from the beginning. Its principal business was buying and selling bonds. It was capitalized at $300,000 preferred stock, and $150,000 common. Appellant never owned any of the preferred stock. The common or voting stock was originally divided between appellant and Emerson, two-thirds to appellant and one-third to Emerson. Later appellant gave 100 shares of common stock to Wilson. None of the three paid anything for their stock. However, they drew dividends thereon. Appellant did, however, from time to time pay in certain funds as the business demanded it. Appellant was president, and there is evidence tending to show that he was in general charge as a superior officer. His particular function was to negotiate the purchase of bond issues. Wilson was treasurer. Emerson was vice president, and his special duty was to superintend bond sales. The business flourished during 1922 and 1923. Thereafter it was unsuccessful. The evidence tends to show that from the beginning of 1925 its losses were heavy and continuous and that by

March its funds were very low and it was being pressed to meet its obligations; that Wilson advised appellant of the situation and that thereupon appellant originated a campaign to sell the preferred stock of the company. The company owned and was holding in its vault certain blocks of bonus common stocks of various corporations acquired by it through appellant in connection with the purchase of various bond issues. There is nothing to indicate that any substantial compensation passed for these stocks. There is substantial evidence that preparatory to the selling campaign and at appellant's request and direction Wilson and Emerson caused these stocks to be entered as assets upon the books of the company (page 110 of the journal) at a valuation of $400,000. As a matter of fact they were practically worthless. They were not saleable or acceptable at the banks as collateral. There is also evidence tending to show that "because it wouldn't look good on a financial statement" and at appellant's direction an indebtedness of the corporation for more than $215,000, principal and interest due the former partnership, was without any payment whatever thereon arbitrarily removed from the books; that a surplus of $186,340.15 was entered upon the books when as a matter of fact there was no surplus; that appellant directed Wilson to make up and deliver to him a condensed statement from the books thus reformed, which statement was further condensed by appellant himself; that appellant then called a meeting of salesmen at the office of the company for April 7, 1925, as preliminary to the selling campaign, presided over and addressed the meeting, urged the salesmen to push the campaign and submitted to them certain highly colored and laudatory circular matter to be used therein, together with the condensed statement above indicated, which was glaringly false, and there is a presumption that appellant as president, chief stockholder, and the active head of the corporation knew of its falsity. Bettman v. U. S., 224 F. 819, 828 (C. C. A. 6). As a result there was sold about $20,000 worth of the company's preferred stock at the par value of $100 per share. This stock was without value. A receivership followed in October.

Based upon this and other evidence not discussed we conclude that the jury was justified in its finding of fraudulent intent and that the defense that appellant did not direct a manipulation of the books; that he was ignorant of their contents; that he did not know the financial situation of the company

or the value of its stock assets which he himself had acquired in 1923 and 1924; that he left the bookkeeping entirely to the bookkeepers and the financial affairs of the company entirely to Wilson and Emerson; and that the stock selling scheme was an honest effort to acquire capital for the enlargement of the business, was incredible. The motion for a directed verdict was therefore properly denied.

▆▆▆▆ Intent may be implied from established facts. Wuichet v. U. S., 8 F.(2d) 561, 562 (C. C. A. 6). Nor can it be said that the evidence in the aggregate is as consistent with innocence as with guilt. To acquire new capital either to enlarge the business or to pay debts was legitimate, but if the scheme to acquire it was fraudulent the intent to use the money lawfully did not render it less so. Sparks v. U. S., 241 F. 777, 782 (C. C. A. 6); Foster v. U. S., supra. Nor does the payment of dividends on July 1, 1925, nor repurchase of some of the shares, even after July 1st, according to an original policy of the company, point convincingly to innocence. The jury may have properly concluded that the payment of dividends and the repurchase of stock was an effort to allay suspicion and retain confidence, especially where it was apparent that there were no profits out of which to pay dividends and no available assets out of which to repurchase stock, except the proceeds of other sales.

▆▆▆ (4) *Books of the Corporation.*—There was no reversible error in permitting their introduction. The evidence indicates that they were correctly kept, with the exception of the particularly relevant entries on page 110 of the journal under date of March 31, 1925, heretofore referred to. The evidence tending to show appellant's relation thereto and the use he thereafter made of these entries gave them exceptional relevancy. See Bettman v. U. S., supra; Wilson v. U. S., 190 F. 427, 437 (C. C. A. 2); Arnold v. U. S., 7 F.(2d) 867, 870 (C. C. A. 7); Foster v. U. S., supra. Without detailed discussion, we are satisfied that the connection of appellant with the books may be easily differentiated from the situation in McDonald v. U. S., 241 F. 793, 800 (C. C. A. 6), and the Worden Case (C. C. A.) 204 F. 1, therein cited.

▆▆▆ ▪(5) *Circumstantial Evidence.*—It was not erroneous to instruct the injury upon circumstantial evidence. The charge in this respect was unexcepted to and was pertinent because the evidence was largely circumstantial, as it is in substantially all cases involving knowledge and intent.

▆▆▆ (6) *Character Evidence.*—Appellant had lived in Chicago for twenty years and did business there. The witness Cooper lived at Kenosha, Wis., about 52 miles from Chicago. The witness Conger lived at Grand Rapids. They were introduced to testify as to the character of appellant for truth and veracity. Their testimony was excluded because they were not acquainted with the general reputation of appellant in Chicago. This was in accordance with the general rule of evidence on the subject and was not error. Wigmore on Ev. (2d Ed.) vol. 3, § 1615; Wharton's Crim. Ev. (10th Ed.) vol. 1, § 58; Waddingham v. Hulett, 92 Mo. 533, 5 S. W. 27; Knode v. Williamson, 17 Wall. (84 U. S.) 586, 588, 21 L. Ed. 670. Further, if we should venture to extend the rule to evidence of general reputation at points distant from Chicago as a basis for supporting character evidence, the difficulty remains that these witnesses advanced no testimony touching upon general reputation at either point upon which evidence of good character might be predicated.

Finding no reversible error, the judgment of the District Court is affirmed.

DENISON, Circuit Judge.

I concur in the affirmance; but there are some aspects of the case which I think should have comment.

The indictment was of the complicated and confused type which seems to be commonly used in these mail fraud cases, and which we have before criticized. That type puts upon the court the burden of extracting the vital point from the mass of more or less related statements, and finding out at the end of the trial what the offense charged really is. In this case, the fraudulent scheme was said to be to get money from stock purchasers by certain false and fraudulent representations as to the stock value. These false representations were thereupon recited. They were fifteen in number, and the truth of each such statement was then specifically denied; the falsity of any one might have been enough to sustain conviction. Several of them were as to matters of opinion, as to which the evidence was such that I think there was nothing justifying conviction. Several of them turned out to be perfectly true. The charge to the jury recited them all and left the jury at liberty to base a conviction on any one of the fifteen. In the common case, I would

think that a conviction upon such a basis ought not to stand.

There were rulings upon the trial, some of which impress me as erroneous. For example: The financial condition of the corporation when these statements were made (April, 1925) was an issue. It appears without dispute that in previous years the business of this company and its predecessor, in promoting and underwriting the financing or refinancing .of manufacturing corporations, had been profitable and successful; that in the fall of 1925 this company failed and went into the hands of a receiver for liquidation. The liquidation continued two or three years; using such liquidation results upon the issue of solvency two or three years before is always unsatisfactory, and, in such a situation as this, I think it too remote to be admissible. Those who estimate the value of a going concern ought not, as a general rule, to be charged retroactively with knowledge of the small values which develop in a much later bankruptcy. Some of the admitted evidence also, concerning the amount finally realized on these assets, was, I think, only hearsay.

However, upon a study of the whole case, I am satisfied that no verdict excepting guilty could have been found by any carefully deliberating jury. This is so clear to me that I would treat the case as we did Robinson v. U. S., 30 F.(2d) 25, 28, and for the reasons there stated, and say that the procedure and rulings which I have mentioned, and other errors if any there were, should be considered nonprejudicial. To my mind, the case centers upon the inclusion in the balance sheet as assets, of the $400,000 of stocks, and the use made of that inclusion. These were common stocks, which, during the previous year or two, the company had received as part of the consideration for its services in financing reorganizations. The practice was that a manufacturing enterprise needing refinancing, applied to the Hyney firm to bring this about. Thereupon, under the Hyney supervision, all of the assets of the enterprise were appraised. These appraisals were, or may be assumed to have been, made by appraisers of good reputation, and there is no reason to assume anything fraudulent about them. Thereupon, it was planned to issue bonds and preferred stock against these appraisals to provide such capital as the enterprise needed, and to issue common stock against the remainder of the assets. The book value of this common stock, was, therefore, as shown by these appraisals. The Hy-

ney firm then underwrote these bonds and preferred stocks, agreeing to take them all at a stated price (e. g., 90 cents for the bonds and 80 cents for the preferred stock), and for their services in reorganizing the concern and marketing the securities, they received whatever profit they could make on the resale of bonds and preferred stock, and also an agreed amount of the common stock. To obtain funds to carry these details through, the Hyney firm borrowed large sums at the Chicago banks, pledging these bonds and preferred stocks. Then, when they sold the bonds or stock, they would take the purchaser's money, redeem the necessary amount from the bank's pledge and send the securities to the purchaser, or sometimes deliver the securities at first to him and then take down from the bank an equivalent amount to be free in their hands. In the spring of 1925, this business became "slow"; they doubtless believed the slow-up was temporary; there were several "prospects" which apparently would develop into business a little later; but they had to have money to keep the business going and the banks would not lend any more on these securities, but, on the other hand, were pressing for reduction of these lines. These common stocks must, in all fairness, be considered generally as having substantial value; but the values were speculative and depended on the continuing ability of the various companies to earn more than their fixed charges. I think it not right to say that these stocks cost the Hyney firm nothing. On the contrary, they represented an unapportioned share of the agreed compensation which the Hyney firm had earned. The term "bonus," as applied to them, is inappropriate and unduly derogatory; but knowing this speculative character and their present lack of value as bank collateral, the Hyney firm had not entered them in its bookkeeping system as being assets. The accumulation of them represented, in the hands of the firm, hopes and expectations; they might eventually turn out to have large values; they might not. The Hyney firm had been succeeded by the Hyney corporation, with preferred and common stock. A minor part of the preferred had been paid in cash; the partners took all the common in exchange for their partnership interests. In this situation, and to meet the imperative need for the additional capital which they could not borrow from the banks, Hyney and associates decided to sell to the public the unissued preferred stock in their corporation and to give some common stock with it. How to make an attractive balance sheet was the question.

Upon this corporate organization, it had apparently assumed to take over the preferred stocks and bonds as if free from the bank debts, and accordingly the interest which it paid from time to time upon these bank debts was charged to the corporate predecessor, the firm. The total of this interest, accumulated to a large amount, would have appeared upon any statement from the existing books as an asset of the corporation. It was at once seen that since the firm really had no responsibility excepting as the partners had stock in the corporation, it would not do to use this debt against the partnership as an asset basis for selling stock. Accordingly, the plan was devised to enter these common stocks as an asset, in substitution (and beyond) for the debt against the firm. Under Hyney's direction, his subordinates ascertained from the different stock issuing companies, or other customary sources, the present book value of these common stocks; and these figures were used in entering these common stocks on the books as corporate assets of the Hyney corporation. There was nothing in this of itself necessarily wrong. As between the corporation and the firm, they had a right to treat these assets in this way. Under the laws of some states, such a transaction, lacking actual fraud, might be treated as full payment of stock subscriptions so that there would be no further liability therefor. A substantial or even a large deficiency in these estimated values as compared with future developments might not be a satisfactory basis upon which to base any charge of fraud.

Hyney's trouble here comes not from the formalities of this transaction; it comes from the dominating amount of these speculative securities and the purpose for which he knew their status as corporate assets was to be used. It must be clear that the president of a corporation who is directing and managing a campaign for selling its stock to the public, upon the basis of its balance sheet statement of assets and liabilities, knows that he is thereby representing to the public that the assets in that statement are included at not more than what may honestly be thought a fair and reasonable figure as a basis for stock selling, and knows that, if those assets are padded in value beyond anything that can be justified by an honest error of judgment in appraising them for public offer, he will thereby be misleading and deceiving those who become purchasers. If he were using this stated valuation for any kind of exchange for the speculative assets of some one else, that would be another question;

but he was proposing to use this valuation as a basis for getting money from a class of people who would not be likely to examine below the surface, and who would accept the financial statement as having been based upon ordinary sound business practices and judgment.

The statement showed that the preferred stock which they were to offer was worth par and the common stock would have a book value of 1.20 on its par. The balance sheet showed a total surplus over current liabilities, which surplus would apply to the preferred and common stocks then outstanding, of about $260,000. The assets, relied upon to meet this liability for debts and for surplus, totaling about $725,000, were a little over $100,-000 in current receivables, and $617,000 for "bonds and stock on the books." From these figures it was evident that any deficiency in these stocks and bonds would at once impair the supposed value of 1.20 for the common stock, and before that deficiency reached $200,000 it would impair the value of the preferred stock already issued as well as of that which was to be sold for cash at par. It appears also of this $617,000, entered as stock and bond assets, $400,000 was made up of these common stocks of other corporations entered at their book value. I think that to make this stock offering upon this basis was so plainly fraudulent as to leave no room for two opinions. The fact was that of the stated values offered in exchange for the subscriber's cash, two-thirds were made up of these speculative stocks, which had little value for sale or for collateral, and Hyney knew all these things perfectly well; indeed, he does not claim to have been ignorant of them excepting as to the details of the method by which his subordinates appraised these stocks. If a subscriber to be approached had been told that the company had capitalized these assets as a basis for selling stock because they were so speculative that the banks would not loan upon them, no one would have purchased; but this was the undisputed fact.

It is not seriously significant that shortly before the collapse Hyney invested $60,000 more of his own, or his wife's, money. That indicates only that he had hope of saving the company; not at all that the balance sheet had been true.

Under the doctrine of Horning v. District, 254 U. S. 135, 41 S. Ct. 53, 65 L. Ed. 185, the jury might have been instructed that, if they believed this undisputed testimony, it was their duty to convict.